Argued and submitted October 21, 2008, reversed and remanded for entry of judgment on first claim for relief and for further proceedings on second claim for relief; otherwise affirmed July 15, 2009

Sondra Lee SHINEOVICH,
*Petitioner-Appellant,*

*and*

Sarah Elizabeth KEMP,
*Respondent-Respondent.*

Sarah Elizabeth KEMP,
*Counterclaim Plaintiff,*

*v.*

Sondra Lee SHINEOVICH,
*Counterclaim Defendant.*

Multnomah County Circuit Court
070363564; A138013

214 P3d 29

Mark Johnson argued the cause for appellant. With him on the briefs was Johnson & Lechman-Su PC.

Murphy McGrew argued the cause and filed the brief for respondent.

Charles F. Hinkle, P. K. Runkles-Pearson, Chin See Ming, Kenneth Y. Choe, and James D. Esseks filed the brief *amici curiae* for American Civil Liberties Union, ACLU Foundation of Oregon, Inc., and Basic Rights Oregon.

Before Armstrong, Presiding Judge, and Rosenblum, Judge, and Sercombe, Judge.

ROSENBLUM, J.

**ROSENBLUM, J.**

In this action for declaratory relief, petitioner challenges the constitutionality of two statutes under which a married man is, by operation of law, deemed to be the legal parent of children born to his wife. Petitioner and respondent were in a same-sex relationship for 10 years, during which time respondent twice became pregnant by artificial insemination. After the parties separated, petitioner brought this action, seeking a declaration that she is a legal parent of the two children born to respondent. She asserted that ORS 109.070(1) (2003) and ORS 109.243[1] create a privilege—legal parenthood by operation of law—on the basis of gender and sexual orientation, in violation of Article I, section 20, of the Oregon Constitution. After the parties submitted their pleadings, the trial court dismissed petitioner's claims for failure to state a claim for relief, and petitioner appeals. We conclude that ORS 109.070 (2003) does not violate Article I, section 20, but that ORS 109.243 does. Accordingly, we reverse and remand.

■ In reviewing the sufficiency of the complaint, we accept as true all well-pleaded allegations in the complaint and give petitioner the benefit of all favorable inferences that may be drawn from the facts alleged. *Granewich v. Harding*, 329 Or 47, 51, 985 P2d 788 (1999). The parties began living together in June 1997. In 2003, they decided to have a child through artificial insemination. With petitioner's consent, respondent was artificially inseminated and became pregnant. In March 2004, Multnomah County began issuing marriage licenses to same-sex couples. The parties obtained a marriage license on March 12, 2004, and were married two weeks later. Respondent gave birth to a son, P, one week after the marriage. The parties rushed to perform the ceremony before his birth specifically with the intent that petitioner would be his legal parent. Petitioner established a

---

[1] ORS 109.070(1) (2003), *amended by* Or Laws 2005, ch 160, § 11; Or Laws 2007, ch 454, § 1, created two presumptions, one conclusive and one disputable, that, under certain circumstances, the child of a married woman is the child of her husband. ORS 109.243 provides that a child born as a result of artificial insemination to which the mother's husband consented has the same relationship with the husband as if the child had been naturally conceived. We quote the pertinent statutory provisions in full below. *See* 229 Or App at 673-74.

parent-child relationship with P and, for all intents and purposes, functioned as his coparent with respondent.

The parties' marriage was declared void on April 14, 2005. *See Li v. State of Oregon*, 338 Or 376, 398, 110 P3d 91 (2005) (declaring that marriage licenses issued to same-sex couples in Multnomah County in 2004 were "void at the time that they were issued").

In mid-2006, respondent again became pregnant by artificial insemination, again with petitioner's consent.[2] The parties separated on November 1, 2006. Respondent gave birth to a daughter, A, on March 25, 2007. After the parties separated, respondent denied petitioner regular contact with the children.

On March 30, 2007, petitioner filed this action for, among other things, declaratory relief.[3] Respondent is the only opposing party named in the complaint, but, pursuant to ORS 28.110, petitioner served a copy of the complaint on the Attorney General.[4] In the first claim, petitioner sought a declaration that ORS 109.070(1) (2003) is unconstitutional. That statute provided, in pertinent part:

"The paternity of a person may be established as follows:

---

[2] Respondent denied that petitioner consented to the artificial insemination either time it was performed. In the current posture of the case, we accept as true petitioner's allegation that she consented to the procedure both times. However, whether petitioner actually consented is a factual issue that will need to be resolved on remand.

[3] Petitioner's complaint also included claims for dissolution of domestic partnership, custody and parenting time, and breach of contract. The latter claim alleged that the parties had entered into a valid oral agreement in which respondent had agreed to consent to petitioner's adoption of the children. The trial court did not dispose of those claims in the limited judgment that is the subject of this appeal, and they are not at issue here. In another claim, petitioner also challenged the constitutionality of ORS 109.125, which specifies who may initiate filiation proceedings. The court dismissed that claim in the limited judgment along with the two claims that are before us. However, petitioner does not assign error to the dismissal of that claim, so we do not address it.

[4] ORS 28.110 provides, in part, that, when declaratory relief is sought, if a statute is alleged to be unconstitutional, "the Attorney General of the state shall also be served with a copy of the proceeding and be entitled to be heard."

"(a) The child of a wife cohabiting with her husband who was not impotent or sterile at the time of the conception of the child shall be conclusively presumed to be the child of her husband, whether or not the marriage of the husband and wife may be void.

"(b) A child born in wedlock, there being no judgment of separation from bed or board, shall be presumed to be the child of the mother's husband, whether or not the marriage of the husband and wife may be void. This shall be a disputable presumption."[5]

Petitioner asserted that, if she were male and married to respondent, that statute would have created legal parentage of P in her by operation of law, without regard to whether she was his biological parent.[6] She further asserted that the statute fails to provide her with the same benefits and protections of legal parentage that it provides to similarly situated married males. Because same-sex couples are not permitted to marry in Oregon, she sought a declaration that the statute unconstitutionally discriminates against her on the basis of gender and sexual orientation.

In her second claim for declaratory relief, petitioner made a similar challenge to the constitutionality of ORS 109.243. That statute provides:

"The relationship, rights and obligation between a child born as a result of artificial insemination and the mother's husband shall be the same to all legal intents and purposes as if the child had been naturally and legitimately conceived by the mother and the mother's husband if the husband consented to the performance of artificial insemination."

Petitioner asserted that, if she were male and married to respondent, that statute would have created legal parentage

---

[5] ORS 109.070(1) was amended by Oregon Laws 2005, chapter 160, section 11, to eliminate the conclusive presumption formerly created by paragraph (a). It was amended again by Oregon Laws 2007, chapter 454, section 1. The parties agree that, because P was born before those amendments took effect, they do not affect our analysis.

[6] Petitioner implicitly acknowledged that, because her relationship with respondent ended before A was born, A would not be presumed to be her child under ORS 109.070(1) (2003).

of both P and A in her by operation of law. She sought a declaration that that statute is unconstitutionally discriminatory as well.

Petitioner did not seek to have the statutes declared invalid; rather, her purpose was to have the privileges afforded to married men extended to similarly situated lesbian women. Accordingly, in the prayer for relief, petitioner requested a declaration that she is a legal parent of both children.

On April 30, 2007, respondent filed a responsive pleading and, on the same day, a motion to dismiss petitioner's claims for declaratory relief under ORCP 21 A(8). In the motion to dismiss, respondent argued that the trial court lacked subject matter jurisdiction, asserting that petitioner had not raised a justiciable controversy. According to respondent, because she has no authority over the application or enforcement of the statutes that petitioner challenges, the court could order no meaningful judicial remedy and would be able to render only an advisory opinion. Petitioner argued in response that

"a controversy exists between [the parties] over [petitioner's] legal relationship to respondent's biological children. This court has the authority to enter a judgment declaring and defining that relationship pursuant to ORS 28.010. The resulting judgment would grant [petitioner] the specific relief of being declared [the children's] legal parent and would be binding on [respondent] in that it would prevent her from asserting that [petitioner] is not the legal parent of [the children]."

The trial court issued a letter opinion stating, without elaboration, that it was granting the motion to dismiss. The court instructed respondent's counsel to draft a limited judgment disposing of the claims for declaratory relief.

Petitioner thereafter obtained new counsel, who sought clarification from the court as to what issues it had considered and resolved. Counsel indicated that the basis of the court's decision to dismiss the claims was unclear. The court clarified its ruling at a hearing on the form of the judgment. It did not expressly address respondent's jurisdictional

arguments. Rather, the court explained that it was dismissing the claims because they failed to state a claim for relief. Specifically, it stated that it viewed petitioner's claims as asserting that a legal parental relationship was established by statute and that, in the court's view, petitioner could not achieve legal parentage through those statutes unless it held them to be unconstitutional, adding, "I don't think they are." Thereafter, the court entered a limited judgment dismissing the claims.

On appeal, petitioner argues that the trial court erred in concluding that ORS 109.070(1) (2003) and ORS 109.243 are constitutional, that they did not create legal parentage in petitioner, and that petitioner's complaint therefore did not state a claim for relief.[7] She renews the arguments concerning the statutes' constitutionality that she made before the trial court.

In response, respondent contends that the state is the only party against which petitioner's constitutional challenges can be pursued and that, because petitioner failed to name the state as a party, there is no justiciable controversy. According to respondent, even if ORS 109.070(1) (2003) and ORS 109.243 are indeed unconstitutional, it is legislative action, not respondent, that has allegedly harmed petitioner, and it is the state, not respondent, that is burdened to defend, uphold, and act in accordance with the constitution. Respondent argues further that, without the state's participation in this case, a court order declaring petitioner a parent would be treated as void by the state. Respondent takes the position that, because the state would treat as void a judgment declaring petitioner to be a legal parent, the declaration would not terminate the controversy.

---

[7] In one argument, petitioner asserts that the trial court may have dismissed the complaint on the ground that a declaratory judgment action is not the appropriate way to establish filiation. That was not the basis of the trial court's ruling, so we do not address petitioner's argument.

Respondent similarly advances several alternative bases for dismissal on which the court did not, in fact, rely. For example, respondent asserts that the court declined jurisdiction on the ground that the public interest would not be served by a declaratory judgment. We reject those arguments without discussion.

■ At the outset, we must consider respondent's jurisdictional argument—namely, that this case presents no justiciable controversy because petitioner failed to name the state as a party. ORS 28.110 provides, in part, that "[w]hen declaratory relief is sought, all persons shall be made parties who have or claim any interest which would be affected by the declaration[.]" In *Carden v. Johnson*, 282 Or 169, 173, 577 P2d 513 (1978), the Supreme Court rejected the Attorney General's contention that, "under ORS 28.110 the state must be made a party to any suit for declaratory relief challenging the validity of one of its statutes." The court noted that ORS 28.110 expressly imposes that requirement "with respect only to municipalities" and ultimately reasoned that it "[did] not agree that the state is necessarily a proper party to every private litigation in which the constitutionality of a law is challenged, though it should properly be admitted as *amicus curiae*." *Id.* at 173-74. In this case, the state has an abstract interest in the constitutionality of its statutes. However, to conclude that such an interest requires the state to be named as a party in order for this case to be justiciable would be contrary to the Supreme Court's holding in *Carden*.[8]

■ In addition to joining necessary parties, for an action to be justiciable under the Uniform Declaratory Judgments Act, ORS 28.010 to 28.160, the parties must have adverse interests, and a decision must affect the rights of the party bringing the action. *Barcik v. Kubiaczyk*, 321 Or 174, 188, 895 P2d 765 (1995) ("[I]n order to receive declaratory relief in Oregon, there must be a justiciable controversy between the parties on which judgment may effectively operate." (Internal quotation marks omitted.)); *Brumnett v. PSRB*, 315 Or 402, 405, 848 P2d 1194 (1993) (a justiciable controversy exists when "the interests of the parties to the action are adverse" and "the court's decision in the matter will have some practical effect on the rights of the parties to the controversy"); *see also Kellas v. Dept. of Corrections*, 341 Or 471, 484-85, 145 P3d 139 (2006) (stating that the presence of a justiciable controversy in a declaratory judgment action is a statutory requirement).

---

[8] As noted above, petitioner did serve a copy of the complaint on the Attorney General pursuant to ORS 28.110, *see* 229 Or App at 673, but the state did not participate in the trial court proceedings.

■■ There is no question that the parties' interests are adverse. Nor can there be any real debate as to whether a declaration that petitioner is a legal parent of the children would have a practical effect on her rights. *See, e.g.,* ORS 109.030 ("The rights and responsibilities of the parents, in the absence of misconduct, are equal * * *."). The possibility of the state treating the declaration as void does not mean that there is no controversy in this case. It may be that further litigation will be necessary if the state refuses to recognize petitioner as a parent, but the fact that a declaratory judgment would not terminate all aspects of a controversy is not a jurisdictional defect. ORS 28.060 gives courts discretion to refuse to enter a declaratory judgment in such a case, but it does not deprive them of jurisdiction.[9] In short, we reject respondent's argument that this action is not justiciable.

We turn to petitioner's arguments on the merits, beginning with her contention that ORS 109.070(1) (2003) is unconstitutional. As she did before the trial court, petitioner contends that the statute affords to married men a privilege—the presumption of being the legal parent of the children of a female spouse—that is not available to her because same-sex couples are not permitted to marry. Accordingly, she argues, the statute violates the right to equal privileges and immunities guaranteed by Article I, section 20, of the Oregon Constitution.

Respondent argues, among other things, that the presumption created by ORS 109.070(1) (2003) relates to *biological* paternity. Given that there is no dispute about whether petitioner is P's biological parent, she argues that the statute cannot be applied to petitioner.

■ We agree with respondent. Even if the statute were broadened so as not to exclude any individual from its reach on the basis of gender or marital status, the presumption still would not apply to petitioner. To construe the statute, we begin by examining the text of ORS 109.070 (2003) in context. *See State v. Gaines,* 346 Or 160, 171, 206 P3d 1042 (2009). We may also consider its legislative history and, if

_____

[9] ORS 28.060 provides, "The court may refuse to render or enter a declaratory judgment where such judgment, if rendered or entered, would not terminate the uncertainty or controversy giving rise to the proceeding."

necessary, other interpretive aids. *Id.* at 171-72. Here, the text, read in context, is dispositive.[10] ORS 109.070(1) (2003) creates a presumption as to who is the biological parent of a child. By the very terms of the statute, for the presumption of parentage to apply, it must be at least possible that the person is the biological parent of the child. The purpose of ORS 109.070(1) (2003) is to establish *paternity*. "Paternity" means "origin or descent from a father" or "male parentage." *Webster's Third New Int'l Dictionary* 1654 (unabridged ed 2002). Even if the gender aspect of the word is disregarded, "paternity" refers to the genetic relationship between parent and child. *See* ORS 109.251 (defining "blood tests" to include "any test for genetic markers to determine paternity"); *Webster's* at 1654 (defining "paternity test" as "a test to determine whether a given man could be father to a particular child made by comparison of the blood groups of the mother, child, and suspected man, a negative result proving that the man cannot be the father while a positive result shows only that it is biologically possible that he may be"). Indeed, the conclusive presumption of paternity does not apply to a married man who is not biologically capable of having conceived a child borne by his wife: ORS 109.070(1)(a) (2003) provides, "The child of a wife cohabiting with her husband *who was not impotent or sterile at the time of the conception of the child* shall be conclusively presumed to be the child of her husband * * *." (Emphasis added.)

It is undisputed that petitioner is not P's biological parent. Thus, even if any requirement based on gender or marital status were eliminated from ORS 109.070(1) (2003), the presumption of parentage created by that statute would not apply to petitioner. It follows that the trial court correctly concluded that ORS 109.070(1) (2003) is not unconstitutionally discriminatory and that petitioner is not entitled to a declaration of legal parentage under that statute.

 Nevertheless, although the parties do not raise this point, the court's dismissal of the claim was erroneous. As we

---

[10] Petitioner has not provided any legislative history revealing a "latent ambiguity" in the text of ORS 109.070 (2003). *See Gaines*, 346 Or at 172 ("[A] party also may use legislative history to attempt to convince a court that superficially clear language actually is not so plain at all—that is, that there is a kind of latent ambiguity in the statute.").

indicated in *Beldt v. Leise,* 185 Or App 572, 576, 60 P3d 1119 (2003),

> "[i]f there is a justiciable controversy, the plaintiff is enti-
> tled to a declaration of its rights, even if that declaration is
> directly contrary to what it believes its rights to be. *See
> Goose Hollow v. City of Portland,* 58 Or App 722, 726-27,
> 650 P2d 135 (1982) (court may not dismiss declaratory
> judgment action for failure to state claim if justiciable con-
> troversy exists, even if plaintiff is not entitled to the relief it
> seeks)."

Accordingly, on remand, the appropriate disposition of peti-
tioner's first claim is to enter a judgment declaring that peti-
tioner is not the legal parent of P under ORS 109.070(1)
(2003).

We turn next to petitioner's argument concerning
ORS 109.243. Again, that statute provides:

> "The relationship, rights and obligation between a child
> born as a result of artificial insemination and the mother's
> husband shall be the same to all legal intents and purposes
> as if the child had been naturally and legitimately
> conceived by the mother and the mother's husband if the
> husband consented to the performance of artificial
> insemination."

Petitioner points out that the statute establishes legal par-
entage in married men whose spouses were artificially
inseminated, without requiring them to go through adoption
procedures and without regard to biological fact. She notes
that no similar provision is made for unmarried parents who
conceive children by artificial insemination. For that reason,
she argues, ORS 109.243 creates a privilege that is not made
available to women in same-sex relationships, who may not
legally marry. *See* Or Const, Art XV, § 5a (limiting marriage
to "one man and one woman"). Petitioner contends that, to
avoid violating Article I, section 20, that privilege must be
extended to women in same-sex relationships. So extended,
she argues, ORS 109.243 applies to make her relationship
with P and A the same as if she were their biological parent.

Respondent argues that, even if ORS 109.243 were
applied without regard to gender or sexual orientation, peti-
tioner failed to allege facts sufficient to establish standing

under the statute. According to respondent, ORS 109.243, when properly construed, provides that, to be recognized as a legal parent of a child conceived by artificial insemination, the spouse of the child's mother must have consented to the procedure *in writing,* a fact that petitioner did not allege.

■ We recently considered and rejected the construction of ORS 109.243 that respondent advances. In *A. C. H. and D. R. H.,* 229 Or App 129, 210 P3d 929 (2009), a marital dissolution case, the husband sought to avoid paying child support for a child conceived by artificial insemination. He argued that he was not the child's legal father, in part, because he had not given written consent to the insemination. We rejected the contention that the consent had to be in writing, holding that, "for purposes of determining the legal relationship between the mother's husband and the child conceived through artificial insemination, * * * the only inquiry is whether the husband 'consented to the performance of artificial insemination.'" *Id.* at 135-36. That holding disposes of respondent's argument here. Because written consent is not a prerequisite to recognition as a legal parent under ORS 109.243, petitioner's failure to allege that she consented to the procedure in writing does not foreclose her claim.

■ We turn, then, to petitioner's contention that ORS 109.243 unconstitutionally creates a privilege that is not granted to all citizens on equal terms. Article I, section 20, provides, "No law shall be passed granting to any citizen or class of citizens privileges, or immunities, which, upon the same terms, shall not equally belong to all citizens." That provision protects against disparate treatment of "true classes"—that is, classes that are defined not by the challenged law itself, but by a characteristic apart from the law, such as gender, ethnic background, residency, military service, and—as pertinent here—sexual orientation. *Tanner v. OHSU,* 157 Or App 502, 521, 524, 971 P2d 435 (1998). Disparate treatment of a subset of true classes—"suspect classes"—is subject to more rigorous scrutiny than disparate treatment of other true classes. Suspect classes are those that have been "the subject of adverse social or political stereotyping or prejudice." *Id.* at 523. Homosexuals constitute a suspect class. *See id.* at 524 ("[I]t is beyond dispute that homosexuals in our society have been and continue to be the

subject of adverse social and political stereotyping and prejudice."). Disparate treatment of suspect classes is permissible only if it can be justified by genuine differences between the class and those to whom privileges or immunities are made available. *Id.* at 523.

In *Tanner*, we concluded that granting a privilege—in that case, eligibility for health insurance benefits for the spouse of an employee—on the basis of marital status violated Article I, section 20, because the privilege was not available to the domestic partners of homosexuals, given that they are not permitted to marry. *Id.* at 525. We could envision no justification for denying eligibility for insurance benefits on the basis of sexual orientation and thus concluded that the privilege was not granted equally to all classes of citizens. *Id.* at 524-25.

■ Before turning to our analysis in this case, we pause to note that, in 2004, six years after we decided *Tanner*, the Oregon voters enacted Article XV, section 5a, of the Oregon Constitution—commonly known as Measure 36—thereby prohibiting the legal recognition of same-sex marriage in this state. This case requires us to consider whether, by amending the constitution to permit the state to limit marriage to heterosexual couples, Measure 36 also permits the state to attach legal benefits to marriage without extending those benefits to same-sex couples. In other words, we must decide whether Measure 36 implicitly amended Article I, section 20, with respect to benefits granted on the basis of marital status, thereby overruling *Tanner*. After oral argument in this case, we concluded that it would be helpful to have the state's view on that issue, so we invited the Attorney General to address it.[11]

The state takes the position that Measure 36 restricts only the right of same-sex couples to marry and does not alter any existing rights of such couples to obtain legal

---

[11] We extended the same invitation to the parties and also granted the motion of *amici curiae* ALCU Foundation of Oregon, Inc., and Basic Rights Oregon, Inc., to file a brief addressing that and other issues. We also invited the state and the parties to address the appropriate remedy in the event we were to conclude that ORS 109.243 violates Article I, section 20, an issue that *amici* addressed in their brief as well. We address that issue later in this opinion.

benefits presently granted on the basis of marital status. Thus, in its view, Measure 36 is not relevant to our analysis in this case.[12]

■■■■■ When construing a constitutional provision enacted through the initiative process, our goal is to discern the intent of the voters. *Li*, 338 Or at 388. In doing so, we begin by considering the text of the provision in its context. "[T]he text of the constitutional provision itself provides the best evidence of the voters' intent." *Id.* Context includes other constitutional provisions as well as case law and any relevant statutory framework in effect at the time that the voters adopted the provision. *Id.* at 388-89. Other interpretive aids include the enactment history of the provision and general maxims of construction.

■■■■■ The text of Measure 36 is unambiguous:

"It is the policy of Oregon, and its political subdivisions, that only a marriage between one man and one woman shall be valid or legally recognized as a marriage."

Or Const, Art XV, § 5a. The text says nothing about benefits or privileges associated with marriage. Nor can benefits or privileges be read into the word "marriage," the definition of which is well established. ORS 106.010 defines the term as "a civil contract entered into in person by males at least 17 years of age and females at least 17 years of age, who are otherwise capable, and solemnized in accordance with ORS 106.150." *See also Webster's* at 1384 (defining "marriage" in pertinent part as "**1 a :** the state of being united to a person of the opposite sex as husband or wife **b :** the mutual relation of husband and wife: **WEDLOCK c :** the institution whereby men and women are joined in a special kind of social and legal dependence for the purpose of founding and maintaining a family" (boldface in original)); *Black's Law Dictionary* 992 (8th ed 2004) (defining "marriage" as "[t]he legal union of a couple as husband and wife").[13] None of those definitions

---

[12] Petitioner and *amici* agree with that assessment. Respondent did not file any response to the questions that we posed after oral argument.

[13] In defining the terms used in statutory and constitutional enactments, "we give words of common usage their plain and ordinary meanings, and we give words that have well-defined legal meanings those meanings." *Fresk v. Kraemer*, 337 Or 513, 520, 99 P3d 282 (2004). In this instance, there is no conflict between the legal

indicates that legal benefits or privileges are inherent in marriage, such that, by limiting marriage itself to heterosexual couples, Measure 36 also limited the legal benefits associated therewith to heterosexual couples.

The text of Measure 36 stands in stark contrast to constitutional amendments that were on the ballot in other states at the same time that Measure 36 was before the Oregon voters. One such amendment expressly bars the State of Georgia from granting marital benefits to same-sex couples: "No union between persons of the same sex shall be recognized by this state as entitled to the benefits of marriage." Ga Const, Art I, § IV(I)(b). Others expressly bar the respective states from giving same-sex relationships legal significance similar to marriage, implying that such relationships may not be granted the benefits of marriage. *See, e.g.*, Ohio Const, Art XV, § 11 ("This state and its political subdivisions shall not create or recognize a legal status for relationships of unmarried individuals that intends to approximate the design, qualities, significance or effect of marriage."); Utah Const, Art I, § 29(2) ("No other domestic union, however denominated, may be recognized as a marriage or given the same or substantially equivalent legal effect."). The inclusion of such provisions in the amendments that the voters in other states considered (and ultimately approved) and the absence of similar provisions in Measure 36 suggests that Measure 36 was not intended to affect legal benefits.

Nothing that we have found in the context of Measure 36 indicates that the term "marriage" was intended to have a meaning other than the legal definition found in ORS 106.010 or the common meaning reflected in the dictionary. To the extent that anything in the enactment history of Measure 36 suggests that the measure was intended to permit the state to exclude same-sex couples from legal benefits granted to married couples, such an intent cannot be squared with the unambiguous text.[14] *Cf. Gaines*, 346 Or at

---

meaning and the ordinary meaning, so we need not determine which meaning the voters intended.

[14] We note that significant portions of the enactment history support the conclusion that Measure 36 was *not* intended to affect legal benefits for same-sex couples. The enactment history of a voter-initiated provision includes

173 ("When the text of a statute is truly capable of only one meaning, no weight can be given to legislative history that suggests—or even confirms—that the legislature intended something different."). Accordingly, we agree with the state's assertion that Measure 36 has no bearing on this case.

■ ■ We turn, then, to our analysis of whether ORS 109.243 violates Article I, section 20. We conclude that it does. ORS 109.243 grants a privilege—legal parentage by operation of law—to the husband of a woman who gives birth to a child conceived by artificial insemination, without regard to the biological relationship of the husband and the child, as long as the husband consented to the artificial insemination. Unlike ORS 109.070(1)(a) (2003), ORS 109.243 does not include an exception if the mother's husband was sterile or impotent at the time of conception. Thus, it does not require that there be at least a possibility of a biological relationship in order for a legal relationship to be recognized. The existence of the legal relationship between the child and the

---

"sources of information that were available to the voters at the time the measure was adopted and that disclose the public's understanding of the measure. Such information includes the ballot title and arguments for and against the measure included in the voters' pamphlet, and contemporaneous news reports and editorial comment on the measure."

*Ecumenical Ministries v. Oregon State Lottery Comm.*, 318 Or 551, 560 n 8, 871 P2d 106 (1994).

In the period leading up to the general election in 2004, representatives of the Defense of Marriage Coalition (DOMC), the organization that secured the signatures needed to place the measure on the ballot, made a number of statements in the news media indicating that the measure was not intended to preclude same-sex couples from receiving the same benefits granted to married heterosexual couples. For example, according to one newspaper, Georgene Rice, the spokesperson for DOMC "said the Coalition's amendment did not preclude the state of Oregon from creating civil unions, so that same-sex couples could have the same state rights as married heterosexual couples." Tom Peterson, *Backers cite definition as issue...*, The Dalles Chronicle, Sept 30, 2004, at A1; *see also, e.g.*, James Sinks, *Gay marriage fight focuses on Oregon*, Hermiston Herald, Oct 1, 2004, at A1 ("Rice said gay and lesbian couples are free to pursue marriage-like rights via a different avenue, such as civil unions * * *."). In a statement in support of Measure 36 in the voters' pamphlet, the executive director of DOMC stated, "Measure 36 does not prevent anyone from having a committed relationship and *does not hinder benefits*." Official Voters' Pamphlet, General Election, Nov 2, 2004, 84 (emphasis added).

Those statements were available to the voters at the time of the election, and, given that they were made by some of the leading proponents of Measure 36, they seem very likely to have informed the voters' understanding of the meaning of and intent behind the measure.

mother's husband turns entirely on the consent of the husband. *See A. C. H.*, 229 Or App at 135-36. In other words, if the husband consented to the procedure, he is, by operation of law—that is, with no need for judicial or administrative filings or proceedings—the child's legal parent.

Because same-sex couples may not marry in Oregon, that privilege is not available to the same-sex domestic partner of a woman who gives birth to a child conceived by artificial insemination, where the partner consented to the procedure with the intent of being the child's second parent. We can see no justification for denying that privilege on the basis of sexual orientation, particularly given that same-sex couples may become legal coparents by other means—namely, adoption. There appears to be no reason for permitting heterosexual couples to bypass adoption proceedings by conceiving a child through mutually consensual artificial insemination, but not permitting same-sex couples to do so. Thus, we conclude that ORS 109.243 violates Article I, section 20.

The question of the appropriate remedy remains.

> " 'Where a statute is defective because of underinclusion there exist two remedial alternatives: a court may either declare [the statute] a nullity and order that its benefits not extend to the class that the legislature intended to benefit, or it may extend the coverage of the statute to include those who are aggrieved by exclusion.' "

*Hewitt v. SAIF*, 294 Or 33, 52, 653 P2d 970 (1982) (quoting *Welsh v. United States*, 398 US 333, 361, 90 S Ct 1792, 26 L Ed 2d 308 (1970) (Harlan, J., concurring)) (brackets in *Hewitt*). In determining which of those alternatives is the more appropriate, we consider "the legislative purpose in providing benefits under the challenged statute; we then resolve what the legislature would have done if faced with the invalid statute." *Id.* at 51. In doing so, we "assess how best to maintain the objective sought to be achieved by the statute." *Id.* at 53.

The purpose of ORS 109.243 is to protect children conceived by artificial insemination from being denied the right to support by the mother's husband or to inherit from the husband. *See* Minutes, Senate Committee on the

Judiciary, HB 3193, June 27, 1977, 8, 12 (so stating). Invalidating the statute would obviously not maintain that objective. Instead, it would undermine it, potentially nullifying the legal parent-child relationship of any such child and the mother's husband. On the other hand, extending the statute's coverage to include the children of mothers in same-sex relationships advances the legislative objective by providing the same protection for a greater number of children.

Furthermore, in 2007, the legislature passed the Oregon Family Fairness Act (OFFA), under which same-sex couples may register as domestic partners and enjoy the same rights, benefits, and privileges extended to married couples under Oregon law. Or Laws 2007, ch 99, §§ 1-9. Those privileges presumably include legal parenthood by operation of law for the domestic partner of a woman who conceives a child by artificial insemination. It would make little sense to invalidate a statute on the ground that it affords a privilege on a discriminatory basis, when the legislature has since acted to remedy that constitutional infirmity. *Cf. Hewitt*, 294 Or at 52-53 (declining to invalidate a discriminatory statute, in part because the legislature had, subsequent to the statute's enactment, considered the discriminatory effect and agreed that it "did not want the statute 'thrown out' ").

Given the purpose of ORS 109.243, the effect that invalidating it would have on some existing legal parent-child relationships, and the legislature's enactment of the OFFA, we conclude that the appropriate remedy is to extend the statute so that it applies when the same-sex partner of the biological mother consented to the artificial insemination.

In summary, we conclude that ORS 109.243 violates Article I, section 20, and that the appropriate remedy is to broaden the statute's reach. Because factual issues raised by petitioner's second claim for relief remain unresolved, *see* 229 Or App at 673 n 2, we remand for further proceedings on that claim.

Reversed and remanded for entry of judgment on first claim for relief and for further proceedings on second claim for relief; otherwise affirmed.