Argued and submitted November 4, 2014, reversed and remanded May 13, 2015

In the Matter of
the Registered Domestic Partnership of:

Karah Gretchen MADRONE,
*Petitioner-Respondent,*
*and*

Lorrena Thompson MADRONE,
*Respondent-Appellant.*

Klamath County Circuit Court
1201759CV; A154894

350 P3d 495

John C. Howry argued the cause for appellant. On the briefs were Brett A. Baumann and Frohnmayer, Deatherage, Jamieson, Moore, Armosino & McGovern, P. C.

Thomas A. Bittner argued the cause for respondent. On the brief were Mark Johnson Roberts and Gevurtz, Menashe, Larson & Howe, P. C.

Before Sercombe, Presiding Judge, and Hadlock, Judge, and Tookey, Judge.

HADLOCK, J.

### HADLOCK, J.

In this case, we consider how to determine whether an unmarried same-sex couple is similarly situated to a married opposite-sex couple for purposes of ORS 109.243 and, thus, entitled to the privilege granted by that statute. ORS 109.243 creates parentage in the husband of a woman who bears a child conceived by artificial insemination if the husband consented to that insemination. The statute's effect is automatic; it requires no judicial or administrative filings or proceedings. In *Shineovich and Kemp*, 229 Or App 670, 214 P3d 29, *rev den*, 347 Or 365 (2009), we held that the statute violated Article I, section 20, of the Oregon Constitution because it granted a privilege—parentage by operation of law—on the basis of sexual orientation, because it applied only to married couples and because, when we decided *Shineovich*, same-sex couples were not permitted to marry in Oregon. To remedy the violation, we extended the statute "so that it applies when the same-sex partner of the biological mother consented to the artificial insemination." *Id.* at 687. It was undisputed that the parties in *Shineovich* were similarly situated to a married opposite-sex couple, so we did not consider to *which* same-sex couples our extension of ORS 109.243 applies.

This case raises that question. During the parties' relationship, respondent gave birth to a daughter, R, who was conceived by artificial insemination. Shortly thereafter, the Oregon Family Fairness Act took effect, allowing same-sex couples to register domestic partnerships, which petitioner and respondent then did. They later separated, and petitioner brought this action for dissolution of the domestic partnership. Among other claims, petitioner sought a declaration that she is R's legal parent by operation of ORS 109.243. The trial court granted summary judgment for petitioner on that claim based on our analysis in *Shineovich*. Respondent appeals. For the reasons set out below, we conclude that ORS 109.243 applies to unmarried same-sex couples who have a child through artificial insemination if the partner of the biological parent consented to the insemination *and* the couple would have chosen to marry had that choice been available to them. The record in this case includes evidence creating a genuine dispute on the latter

point. Accordingly, the trial court erred in entering summary judgment, and we reverse.

The parties present fairly divergent views of the facts. Because this appeal comes to us following a grant of summary judgment, we view the facts in the light most favorable to respondent, the nonmoving party. *Jones v. General Motors Corp.*, 325 Or 404, 420, 939 P2d 608 (1997). The parties, who are both women, met briefly in March 2004 in Oceanside, Oregon, where petitioner lived. Respondent, who lived in Colorado at the time, had recently been in a serious car accident that resulted in numerous injuries and required extensive rehabilitation. The parties corresponded after respondent returned to Colorado. Three months later, respondent returned to Oceanside for a week, during which the parties began a romantic relationship. They wanted to live together, and they moved to Colorado, where respondent continued her rehabilitation from the car accident.

During their time in Colorado, petitioner pressured respondent to hold a "commitment ceremony" with family and friends. The parties agreed that they did not want to seek a legal relationship, because they "did not believe in such social constructs" and "shared a common belief in freedom from marriage." Respondent was hesitant about having a commitment ceremony because petitioner was becoming more controlling of respondent and of their situation. Respondent took comfort in knowing that a ceremony would not be legally binding with respect to either the parties' relationship or any children that either party might have. The parties believed that, if one of them had a child, the other would not automatically be recognized as a legal parent, and they "made no agreements of any kind that would be binding upon a child either of [them] chose to have * * *." They believed that, if they chose "to be parents together," they would have to take legal action to "make it official."

Notwithstanding respondent's reservations, the parties eventually agreed that they would have the commitment ceremony. Together, they chose and bought rings and dresses for the ceremony and registered for gifts. In mid-2005, respondent succumbed to pressure from petitioner to

move back to Oregon. The parties returned to Oceanside and held the commitment ceremony that September, as they had planned. Petitioner and respondent exchanged vows and rings at the ceremony. For several years thereafter, the parties had annual anniversary photos taken in the dresses that they had worn that day.

The month after the ceremony, the parties accepted joint positions managing the Clifftop Inn in Oceanside. They lived and worked at the inn, renovating the business and the premises. In March 2007, they bought the inn.

Respondent had wanted to have a child since before the parties met. By spring 2007, that desire had become urgent. She told petitioner that she "was going to have a child of [her] own no matter what." Respondent felt that it was her decision, and it did not matter to her whether she had the child with petitioner or not. Petitioner was initially hesitant about having a child at that time because she was concerned about the parties' financial stability and about the fact that working at the inn consumed so much of their time and energy. Respondent also had "mixed thoughts" about it, but they eventually "romanticized it and talked about doing it together." Respondent was concerned about having to "legally share" her baby with the biological father, so the parties decided to use two sperm donors in order to obscure the father's identity. Respondent wanted petitioner to be biologically related to the child, so she suggested asking petitioner's brothers if they would donate sperm. Only one of the brothers agreed, so respondent asked a friend of hers, and he agreed to be the other donor. A few days apart, the parties obtained the sperm donations and respondent was artificially inseminated. Petitioner assisted with the first insemination procedure but not the second. Respondent became pregnant.

The parties' relationship deteriorated during the pregnancy. Respondent gave birth to the baby, R, on January 21, 2008. By that point, respondent later asserted, the parties were "nothing more than 'roommates.'" After R was delivered, petitioner told respondent that she had not realized how hard it would be to not have a biological connection with the baby.

Both parties legally changed their last names. Before R was born, respondent had often considered changing her own last name, and, having studied matrilineal societies, she wanted her daughter to have a "powerful, independent" last name. Respondent and petitioner both liked the name Madrone, and they agreed to give R that name. They both changed their last names to Madrone about two weeks after R was born, and it is the surname listed for R on her birth certificate.

The summary judgment record does not disclose who filled out R's birth certificate, but petitioner was not listed as a parent. Respondent did not attempt to put petitioner's name on the birth certificate, because she did not want petitioner to be R's legal parent. Respondent stated in an affidavit that she was "always clear that [she] was the legal, biological and SOLE guardian" of R. She also said, "I had the choice to add [petitioner] to my daughter's birth certificate, and I never did and never intended to." Petitioner never asked to have her name added. The parties were both aware that petitioner's name could be added to the birth certificate, but, in respondent's words, "because of an overall deteriorated relationship and a disconnect in any parenting of [R] by petitioner, it never happened."

Nonetheless, the parties filed a declaration of domestic partnership in March 2008.[1] How the domestic partnership came about is unclear. In her affidavits in opposition to petitioner's motion for summary judgment, respondent gave somewhat conflicting accounts about signing the domestic partnership paperwork. In her first affidavit, she stated that, while she was still recovering from childbirth, the midwife who assisted with R's delivery told respondent that she had to sign the paperwork. According to respondent, she was "out of it" and "not completely aware" of what she was doing; she signed the documents and only later

---

[1] The parties registered their partnership in Tillamook County under the Oregon Family Fairness Act (OFFA), ORS 106.300 to 106.340, which provided for the "establishment of a domestic partnership system [to] provide legal recognition to same-sex relationships." ORS 106.305(6). The OFFA was signed into law in 2007, "but because of a court challenge, did not go into effect until February 4, 2008." *Slater v. Douglas County*, 743 F Supp 2nd 1188, 1190 (D Or 2010). Thus, the OFFA was not in effect when R was born.

realized what she had done. In her second affidavit, respondent's story changed from not having been aware of what she was doing to having felt pressured to sign the paperwork. Respondent stated that the midwife "had her own agenda" and that respondent was "scrambled by the strength of that agenda," not to mention still in recovery from giving birth. Respondent said that she "never would have sought it, but when [the midwife] showed up with it and said to do it, [she] felt pressured and wrong not to." According to respondent, the midwife notarized the paperwork right then.

Documentary evidence conflicts with both of respondent's accounts. A copy of the declaration of domestic partnership that the parties actually filed indicates that both parties signed it, and the midwife notarized it, on February 19, 2008, nearly a month after R was born.

R was reared with "attachment parenting," a practice that calls for more-or-less constant physical contact between the baby and a caregiver. In respondent's understanding, it is a "mother-centered philosophy" that "does not allow for 'co-parenting.'" R slept between petitioner and respondent in their bed at night, but otherwise, respondent generally carried R in a sling, and R was dependent on her "for everything." Petitioner would spend time with R, but never for very long without respondent being present and never alone for a night, as respondent "always had concerns" about petitioner and R "being alone together."

The parties separated in 2012 and respondent subsequently denied petitioner regular contact with R. Later that year, petitioner commenced this action for dissolution of the domestic partnership. In the operative petition, she asserted a claim for declaratory relief, seeking a declaration that she is a legal parent to R. Petitioner alleged that, at the time of R's conception and birth, she was respondent's "domestic and life partner," that she and respondent had planned the pregnancy with the intent to raise the child together, and that she had consented to the artificial insemination procedure. Petitioner also alleged that the parties would have married had Oregon law permitted them to.

In support of the declaratory-relief claim, petitioner relied on ORS 109.243, which provides:

"The relationship, rights and obligation between a child born as a result of artificial insemination and the mother's husband shall be the same to all legal intents and purposes as if the child had been naturally and legitimately conceived by the mother and the mother's husband if the husband consented to the performance of artificial insemination."

Petitioner alleged that the statute unconstitutionally discriminated against her on the basis of sex and sexual orientation because, if she were male and married to respondent, it would create legal parentage in her without regard to whether she was R's biological parent.

Petitioner later moved for summary judgment on her declaratory-relief claim. She relied on our opinion in *Shineovich* in support of the motion. In *Shineovich*, we explained that "ORS 109.243 grants a privilege—legal parentage by operation of law—to the husband of a woman who gives birth to a child conceived by artificial insemination, without regard to the biological relationship of the husband and the child, as long as the husband consented to the artificial insemination." 229 Or App 685. We held that the statute violates Article I, section 20, of the Oregon Constitution:

"Because same-sex couples may not marry in Oregon, that privilege is not available to the same-sex domestic partner of a woman who gives birth to a child conceived by artificial insemination, where the partner consented to the procedure with the intent of being the child's second parent. We can see no justification for denying that privilege on the basis of sexual orientation, particularly given that same-sex couples may become legal coparents by other means—namely, adoption. There appears to be no reason for permitting heterosexual couples to bypass adoption proceedings by conceiving a child through mutually consensual artificial insemination, but not permitting same-sex couples to do so. Thus, we conclude that ORS 109.243 violates Article I, section 20."

*Id.* at 686. We went on to hold that the appropriate remedy for the violation was to "extend the statute so that it applies when the same-sex partner of the biological mother consented to the artificial insemination." *Id.* at 687.

In her motion, petitioner argued that, under *Shineovich*, "there are two requirements for application of

the statute to [R's] situation: that the parties be domestic partners and that [petitioner] consent to the insemination." She asserted that both requirements were satisfied and, thus, that the court should grant summary judgment in her favor.

In response to the motion, respondent argued that *Shineovich* is distinguishable from this case. She asserted that, there, the parties were registered domestic partners before their children were born, whereas she and petitioner did not become domestic partners until nearly two months after R was born. Respondent contended that "the protections afforded in ORS 109.243 apply to domestic partners, not simply people in a relationship." According to respondent, "[i]f petitioner were male, the situation at hand would be that of a boyfriend trying to assert parental rights over a child who was born before the marriage and is undisputedly not the biological father." Respondent also argued that she had never consented to petitioner being considered her "husband equivalent" and that "to presume such consent now would be to deprive Respondent of significant due process rights to consent or withhold consent to the biological and/or legal paternity of a child born of her body." Respondent argued that this case is further distinguishable from *Shineovich* because, in that case, "the parties were unable to have both parties' names on the birth certificate, but in this case the parties were able, but chose not, to add Petitioner's name to the birth certificate. This gives insight into the parties' intent * * *."

After a hearing, the trial court granted the motion for summary judgment. In a letter opinion, the court stated:

"No pertinent facts are in dispute regarding the nature of the parties' relationship prior to the birth of [R]. It is crystal clear that they lived together as a couple, intended to remain together, and intended to have a child and to co-parent the child. It is evident that [petitioner] consented to the performance of the artificial insemination."

The court entered a limited judgment declaring that R is the child of petitioner and respondent "the same as if born to them in lawful wedlock" and ordering the State Registrar and the Center for Health Statistics to issue a birth certificate for R designating both parties as legal parents.

Respondent appeals, assigning error to the trial court's grant of summary judgment. She makes three primary arguments. First, respondent contends that summary judgment was inappropriate because there are factual disputes that, if resolved in her favor by a factfinder, distinguish this case materially from *Shineovich*. Second, she argues that the trial court's interpretation of *Shineovich* actually *creates* a privilege or immunity that is not granted to all citizens on equal terms, in violation of Article I, section 20. Specifically, respondent asserts that the trial court created a privilege for women in opposite-sex nonmarital relationships that women in same-sex relationships do not have: sole legal-parent status for a woman who conceived a child through artificial insemination, did not seek the consent of her partner, and did not intend to be a legal co-parent with her partner. Finally, respondent argues that the trial court's interpretation of *Shineovich* deprives respondent of her due process parental right to make decisions concerning the care, custody, and control of R. We address those arguments in turn.

Respondent's argument that this case is factually distinguishable from *Shineovich* misses the mark, as we addressed a different question in *Shineovich* than we address in this case. In *Shineovich*, we analyzed only whether ORS 109.243 violates Article I, section 20, because it denies a privilege to the same-sex partner of a woman who conceives a child through artificial insemination and, having concluded that the statute does violate Article I, section 20, held that the appropriate remedy was to extend the statute "so that it applies when the same-sex partner of the biological mother consented to the artificial insemination." 229 Or App at 687. Beyond addressing those broad points, we did not have reason to articulate a precise standard by which to determine whether the same-sex partner of a mother who conceived by artificial insemination comes within the reach of ORS 109.243. We attempt to draw the line more precisely here.

Article I, section 20, provides, "No law shall be passed granting to any citizen or class of citizens privileges, or immunities, which, upon the same terms, shall not equally

belong to all citizens." As we explained in *Shineovich*, that provision of the constitution

> "protects against disparate treatment of 'true classes'— that is, classes that are defined not by the challenged law itself, but by a characteristic apart from the law, such as gender, ethnic background, residency, military service, and—as pertinent here—sexual orientation. *Tanner v. OHSU*, 157 Or App 502, 521, 524, 971 P2d 435 (1998). Disparate treatment of a subset of true classes—'suspect classes'—is subject to more rigorous scrutiny than disparate treatment of other true classes. Suspect classes are those that have been 'the subject of adverse social or political stereotyping or prejudice.' *Id.* at 523. Homosexuals constitute a suspect class. *See id.* at 524 ('[I]t is beyond dispute that homosexuals in our society have been and continue to be the subject of adverse social and political stereotyping and prejudice.'). Disparate treatment of suspect classes is permissible only if it can be justified by genuine differences between the class and those to whom privileges or immunities are made available."

229 Or App at 681-82. "[R]equiring privileges or immunities to be granted 'equally' permits the legislature to grant privileges or immunities to one citizen or class of citizens as long as similarly situated people are treated the same." *State v. Savastano*, 354 Or 64, 73, 309 P3d 1083 (2013). If a statute does not treat similarly situated people the same, the statute violates Article I, section 20, and we must determine whether to invalidate the statute or to extend it so that it applies to all who are similarly situated. We will opt to extend the statute if doing so "advances the purpose of the legislation and comports with the overall statutory scheme." *Hewitt v. SAIF*, 294 Or 33, 53, 653 P2d 970 (1982). Thus, in determining whether the protections of ORS 109.243 must be extended to a particular citizen or class of citizens, we must consider whether that person or class is similarly situated to the persons or classes expressly affected by the statute.

In *Shineovich*, we held that ORS 109.243 violates Article I, section 20, because it creates a privilege that "is not available to the same-sex domestic partner of a woman who gives birth to a child conceived by artificial insemination, where the partner consented to the procedure with the

intent of being the child's second parent." 229 Or App at 686. In rejecting respondent's contention that the statute does not apply in this case because the parties did not establish a legal relationship before R was born, the trial court noted our reference to intent in *Shineovich*. The court stated that we had "focused on the parties' intent, not upon their legal status."

In retrospect, we recognize that our reference in *Shineovich* to the nonbiological partner's intent to be the child's second parent may be misleading. The reference simply reflected the facts of that case—there was no question that the petitioner in *Shineovich* intended to be the children's second parent. *See id.* at 672 ("The parties rushed to perform the ceremony before [the first child's] birth specifically with the intent that petitioner would be his legal parent."). We did not mean for that fact to establish a benchmark for determining whether ORS 109.243 should be applied to any particular same-sex couple. When it enacted the statute, the legislature may have assumed that any husband who consented to his wife's being artificially inseminated intended to be the resulting child's parent, and thus saw no need to include an intent requirement in the statute. Whatever the reason, the statute does not turn on intent, and our ultimate conclusion in *Shineovich* reflects that. We concluded that "the appropriate remedy is to extend the statute so that it applies when the same-sex partner of the biological mother consented to the artificial insemination." 229 Or App at 687.

Extending the statute simply on the basis of intent to be a parent would comport with one purpose of the legislation—protecting the support and inheritance rights of children conceived by artificial insemination—but it would not be consistent with the overall statutory scheme—specifically, the legislature's decision to make the statute apply only to children of married couples. If an unmarried opposite-sex couple conceives a child by artificial insemination using sperm from a donor, the statute does not apply, even if the couple, in the words that the trial court used to describe petitioner and respondent, "lived together as a couple, intended to remain together, and intended to have a child and to co-parent the child." Accordingly, it would be inappropriate for courts to extend the statute to same-sex couples

solely on the basis of one or both of the parties' intent to have the nonbiological party assume a parental role. *See Hewitt,* 294 Or at 53 (extension of a statute should "comport[] with the overall statutory scheme"). Just as an opposite-sex couple may be fully committed to their relationship and family but choose not to marry, a same-sex couple, given the option to marry, could make that same choice—commitment without marriage. Because ORS 109.243 would not apply to an opposite-sex couple that made that choice, it follows that the statute also should not apply to same-sex couples that make the same choice.

We therefore conclude that *choice* is the key to determining whether ORS 109.243 applies to a particular same-sex couple. Ultimately, the distinction between married and unmarried heterosexual couples is that the married couples have chosen to be married while the unmarried couples have chosen not to be. And, as we have explained, that choice determines whether ORS 109.243 applies. Given that same-sex couples were until recently prohibited from choosing to be married, the test for whether a same-sex couple is similarly situated to the married opposite-sex couple contemplated in ORS 109.243 cannot be whether the same-sex couple chose to be married or not. Rather, the salient question is whether the same-sex partners *would have* chosen to marry before the child's birth had they been permitted to.

Whether a particular couple would have chosen to be married, at a particular point in time, is a question of fact. In some cases, the answer to that question will be obvious and not in dispute. For example, there was no disputing that the parties in *Shineovich* would have chosen to marry—they actually did make that choice, and were not *legally* married only because their marriage was later declared void *ab initio. Shineovich,* 229 Or App at 672-73. In other cases, the answer will be less clear. A number of factors may be relevant to the fact finder's determination. A couple's decision to take advantage of other options giving legal recognition to their relationship—such as entering into a registered domestic partnership or marriage when those choices become available—may be particularly significant. Other factors include whether the parties held each

other out as spouses; considered themselves to be spouses (legal purposes aside); had children during the relationship and shared childrearing responsibilities; held a commitment ceremony or otherwise exchanged vows of commitment; exchanged rings; shared a last name; commingled their assets and finances; made significant financial decisions together; sought to adopt any children either of them may have had before the relationship began; or attempted unsuccessfully to get married. We hasten to emphasize that the above list is not exhaustive. Nor is any particular factor dispositive (aside from unsuccessfully attempting to get married before same-sex marriages were legally recognized in Oregon, as happened in *Shineovich*), given that couples who choose not to marry still may do many of those things. Instead, we view the factors as tending to support, but not compelling, an inference that a same-sex couple would have married had that choice been available.

In this case, the summary judgment record includes evidence pointing to two factors that tend to support the opposite inference—that the couple would not have married in any event: rejection of the institution of marriage and intent not to share legal parentage of any children born during the relationship. We use the phrase "tend to support" advisedly, particularly with respect to rejecting the institution of marriage. A factfinder would need to evaluate a professed rejection of marriage carefully in the light of a couple's conduct and history. It stands to reason that a person who has been denied the benefits of a social institution might react to that denial by rejecting the institution's validity or worth but might, once the prohibition is lifted, change his or her view and embrace the institution. Because the question is whether a couple would have married *if they could have,* the factfinder must determine what the individual's views would have been if marriage had not been prohibited. In some cases, it may be reasonable to infer that the individual's views would not have changed—that is, they still would have declined to marry, just as many committed opposite-sex couples do. In other cases, the more reasonable inference may be that a same-sex couple's rejection of marriage was rooted in the prohibition itself and that, indeed, the couple would have married had the law allowed.

With the above standards in mind, we turn to whether summary judgment was appropriate in this case. "The court shall grant [a summary judgment] motion if the pleadings, depositions, affidavits, declarations and admissions on file show that there is no genuine issue as to any material fact and that the moving party is entitled to prevail as a matter of law." ORCP 47 C. Respondent stated in her affidavits that the parties did not want to enter into a legal relationship, because they "did not believe in such social constructs." A factfinder could find that respondent was not credible or, given that the parties registered a domestic partnership (the closest thing to marriage that the state offered to same-sex couples at the time) shortly after such partnerships became available, that her view would have been different had same-sex marriage not been prohibited. However, because the case is in a summary-judgment posture, we must draw all reasonable inferences in respondent's favor. *Jones,* 325 Or at 420. A factfinder could reasonably infer, on this record, that the parties would not have chosen to marry even if the law had permitted them to. If the factfinder determines that the parties would not have married in any event, ORS 109.243 would not apply, and petitioner would not be entitled to a declaration that she is R's legal parent in accordance with that statute. It follows that issues of material fact remain and, therefore, that the trial court erred in granting summary judgment.

As noted above, respondent argues that ORS 109.243 does not apply for another reason, namely, that petitioner did not consent to the artificial insemination. Because the meaning of "consent" will be at issue on remand, we address it briefly here. Respondent understands "consent" to require that the biological mother not only *received* the approval of her partner for the artificial insemination, but that she also *sought* that approval in the first place. Respondent notes that the common definition of "consent" is "give assent or approval," *see Webster's Third New Int'l Dictionary* 482 (unabridged ed 2002). She argues that, "before there can be 'consent,' there must first be a request for 'assent or approval.'" In addition, respondent contends that that the use of the word "consent" indicates a legislative intent to limit the application of ORS 109.243 to couples

who intend to be legal coparents at the time of conception. In other words, according to respondent, implicit in a would-be biological mother's request for consent to artificial insemination is a request to share the legal benefits and burdens of parentage.

Respondent's argument raises an issue of statutory construction. To determine whether the legislature intended "consent" to be understood to include intent by the mother to share legal parentage, we look to the text of ORS 109.243 in context and to any relevant legislative history. *State v. Gaines*, 346 Or 160, 171-72, 206 P3d 1042 (2009). As respondent notes, the common meaning of "consent" is "give assent or approval." *Webster's* at 482. Nothing about that term itself or the statutory context supports respondent's argument that "consent" requires that the artificially inseminated woman intend to share legal parentage with her husband. Nor does the legislative history support that view. In short, ORS 109.243 requires nothing more than that the mother's husband give assent or approval to the performance of artificial insemination. We acknowledge that, as applied in determining which same-sex couples are similarly situated to married opposite-sex couples for purposes of applying ORS 109.243, an intent not to share parentage might indicate that a same-sex couple would not have chosen to marry. However, we see no reason that such intent should bear on the issue of "consent" for couples that would have married.

We turn finally to respondent's due process argument. Respondent asserts that the Due Process Clause of the Fourteenth Amendment to the United States Constitution "'protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children.'" (Quoting *Troxel v. Granville*, 530 US 57, 66, 120 S Ct 2054, 147 L Ed 2d 49 (2000).) Respondent acknowledges that that "right is not absolute," but she contends that her decision to be R's sole legal parent must be accorded "some special weight," and that applying ORS 109.243 in this case would violate her right to make decisions concerning R's care, custody, and control.

We decline to address that argument for two reasons. First, the parties' very brief arguments on appeal do

not adequately grapple with the difficulty in "identify[ing] the scope of the parental rights protected by the Due Process Clause." *O'Donnell-Lamont and Lamont,* 337 Or 86, 100, 91 P3d 721 (2004), *cert den,* 543 US 1050 (2005). More fundamentally, the due process argument is premature, given our resolution of this appeal. Neither the parties nor the trial court had the benefit of this opinion—and its articulation of a standard for determining when ORS 109.243 applies in the context of same-sex relationships—when they addressed the due process question. On remand, if respondent chooses to renew her argument that the Due Process Clause prohibits application of ORS 109.243 in the circumstances of this case, we expect that her argument will address, in detail, how application of the standard that we have announced in this decision results in an unconstitutional interference with her parental rights.

To summarize, the summary judgment record, viewed in the light most favorable to respondent, establishes that there are issues of material fact that, if resolved in respondent's favor, lead to the conclusion that the parties were not similarly situated to a married heterosexual couple. If the factual disputes were resolved in that manner, the result would be that ORS 109.243 does not operate to make petitioner R's legal parent. It follows that the trial court erred in granting petitioner's summary judgment motion.

Reversed and remanded.