[Cite as *In re L.E.S.*, 2024-Ohio-165.]

# IN THE COURT OF APPEALS
## FIRST APPELLATE DISTRICT OF OHIO
## HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| IN RE: L.E.S., E.S., N.S. | : | APPEAL NOS. C-220430 |
| | | C-220436 |
| | : | TRIAL NO.    F12-728Z |
| | | |
| | : | *O P I N I O N.* |

Appeals From:  Hamilton County Juvenile Court

Judgment Appealed From Is:  Reversed and Cause Remanded

Date of Judgment Entry on Appeal: January 19, 2024

*Durst Kerridge Khatskin LLP, Alexander J. Durst, Paul R. Kerridge, Link Nestheide Family Law* and *Diana M. Link*, for Appellant/Cross-Appellee,

*Hilton Parker LLC, Jonathan L. Hilton, Geoffrey C. Parker, Essig & Evans LLP* and *Danielle L. Levy*, for Appellee/Cross-Appellant,

*ACLU of Ohio Foundation, Amy R. Gilbert* and *Freda J. Levenson*, for Amici Curiae American Civil Liberties Union of Ohio Foundation and National Association of Social Workers,

*Frost Brown Todd LLP, Ryan W. Goellner*, *Lewis Brisbois, Bisgaard & Smith LLP* and *Jason A. Paskan*, for Amicus Curiae The Nathaniel R. Jones Center for Race, Gender, and Social Justice.

**ZAYAS, Presiding Judge.**

**{¶1}** The "right to marry is a fundamental right inherent in the liberty of the person." *Obergefell v. Hodges*, 576 U.S. 644, 675, 135 S.Ct. 2584, 192 L.Ed.2d 609 (2015); *see, e.g., Loving v. Virginia*, 388 U.S. 1, 12, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967); *Zablocki v. Redhail*, 434 U.S. 374, 383-384, 98 S.Ct. 673, 54 L.Ed.2d 618 (1978). In *Obergefell*, the United State Supreme Court held that states may not constitutionally exclude same-sex couples from "marriage on the same terms and conditions as opposite-sex couples." *Obergefell* at 675-676. Consequently, states cannot constitutionally deprive same-sex couples of the "constellation of benefits" linked to marriage under state law. *Id.* at 646-647, 670; *Pavan v. Smith*, 582 U.S. 563, 564, 137 S.Ct. 2075, 198 L.Ed.2d 636 (2017).

**{¶2}** Under R.C. 3111.95(A), Ohio conclusively recognizes a consenting different-sex spouse of a married woman as the natural parent of a child conceived as a result of nonspousal artificial insemination during the marriage. *Obergefell* clearly compels the result that such legal recognition must be equally extended to a consenting same-sex spouse of a married woman under Ohio law as Ohio has linked the establishment of a parent-and-child relationship to the marriage in such a situation and therefore provides married couples with a form of legal recognition not available to unmarried couples. *See Pavan* at 567; *see also Harrison v. Harrison*, 643 S.W.3d 376, 382-383 (Tenn.App.2021).

**{¶3}** The more difficult question presented to this court on appeal is whether the same-sex consenting partner of a woman subject to nonspousal artificial insemination can be recognized as the legal parent of the child(ren) conceived as a result of the nonspousal artificial insemination where the parties were never married but would have been at the time of the child(ren)'s conception had they legally been

able to do so and have the marriage recognized in their home state of Ohio. For the reasons that follow, we hold that such a partner should be recognized as a legal parent under Ohio law where it is affirmatively established that the parties would have been married at the time of the child(ren)'s conception but for Ohio's unconstitutional ban on same-sex marriage. *See In re Domestic Partnership of Madrone*, 271 Or.App. 116, 128, 350 P.3d 495 (2015).

{¶4} In the instant case, the juvenile court determined that there was no pathway under Ohio law for appellee/cross-appellant C.E. to be recognized as the legal parent of the child(ren) consensually conceived by her same-sex partner, appellant/cross-appellee P.S., as a result of nonspousal artificial insemination during their relationship, despite C.E.'s assertion that the parties would have been married at the time of conception had they legally been able to do so. Instead, based on a number of other factors, the trial court found that P.S. relinquished sole custody of the children in favor of shared custody with C.E. under *In re Bonfield*, 97 Ohio St.3d 387, 2002-Ohio-6660, 780 N.E.2d 241, and *In re Mullens*, 129 Ohio St.3d 417, 2011-Ohio-3361, 953 N.E.2d 302. Because we hold that in this case the juvenile court should have first determined whether the parties would have been married at the time of the child(ren)'s conception—but for Ohio's unconstitutional ban on same-sex marriage—before finding that C.E. could not be recognized as a legal parent of the child(ren) under Ohio law, we reverse the juvenile court's parentage determination and remand the cause for further proceeding consistent with this opinion and the law. Since the juvenile court's judgment on remand could render P.S.'s assignments of error pertaining to custody and visitation moot, determination of P.S.'s assignments of error is premature, and we decline to address them.

**I. Factual and Procedural History**

{¶5} On March 9, 2012, P.S. and C.E. jointly filed an R.C. 2151.23(A)(2) nonparent petition for custody regarding L.E.S., born February 16, 2012. The petition indicated that P.S. was contractually relinquishing custody of L.E.S. based on a cocustody agreement (the "custody agreement") between the parties. The custody agreement provided that the parties lived together as a family with L.E.S. and L.E.S. had no legal, presumed, or alleged father under R.C. 3111.95(B) as L.E.S. was conceived using anonymous artificial insemination. Under the agreement, P.S. expressly relinquished any right she may have to exclusive or paramount care, custody, and/or control of L.E.S.

{¶6} On October 11, 2018, P.S. filed a motion for contempt and to terminate or modify the custody agreement based on a change in circumstances. The motion argued that she was the birth mother of L.E.S., and that C.E. was not acting in the best interest of the child.

{¶7} In response, C.E. filed a complaint for parentage and custody of L.E.S., plus E.S. and N.S., born April 11, 2014. The complaint maintained that the juvenile court had jurisdiction to determine parentage and custody under R.C. 3111.01-3111.99 and 2151.23(A)(2), the update in law before and after *Obergefell*, 576 U.S. 644, 135 S.Ct. 2584, 192 L.Ed.2d 609, and *In re Mullens*, 129 Ohio St.3d 417, 2011-Ohio-3361, 953 N.E.2d 302. The complaint asserted that all three children were conceived using artificial reproductive technology ("ART") with the same anonymous sperm donor matching the ethnicity of C.E. The complaint further asserted that P.S. gave birth to the children with the active and consistent involvement of C.E.—both financially and otherwise—and both parties' written consent. C.E. averred in the complaint that, although same-sex marriage was not legally recognized in Ohio during their 12-year

4

relationship, the parties held a "civil commitment ceremony" prior to the birth of the children and presented as married to friends, family, and others.

{¶8} P.S. subsequently filed a motion to dismiss C.E.'s complaint, arguing, among other things, that no established Ohio law allowed for any parental rights to be bestowed upon C.E. for any of the children, and that the parties ended their relationship shortly after E.S. and N.S. were born and never entered into a shared-custody agreement for E.S. and N.S. After responsive briefing and oral argument, the magistrate entered an order on April 19, 2019, denying P.S.'s motion to dismiss.

{¶9} Hearings were held on December 6 and December 13, 2019, and January 31, September 11, and September 18, 2020. C.E. testified that the parties were engaged and committed exclusively to each other. However, at the time of their engagement, they were unable to legally marry. She further testified that they were not married at the time the children were born because they were unable to legally marry. She agreed in her testimony that the parties could have traveled to another state to be married during their relationship and that the parties had the ability to travel as they traveled often. She said they even traveled to Boston to be married. However, they concluded that their marriage would not be acknowledged in Ohio, so they ultimately did not marry.

{¶10} In contrast, P.S.'s sister testified at the hearing that, when asked, P.S. once said that the parties were not getting married.

{¶11} On January 26, 2021, the magistrate entered a decision on the parentage, custody, and visitation issues. Relevant for our purposes here, the magistrate denied C.E.'s request to be established as a legal parent, finding no basis in Ohio law to do so.

**{¶12}** Both parties filed objections to the magistrate's decision. Among other things, C.E. argued that the magistrate erred in finding that Ohio law did not allow for a determination that she was a legal parent of the children post-*Obergefell*. P.S. asserted several objections pertaining to the custody and visitation issues, among other things. On August 5, 2022, the juvenile court entered a decision generally overruling all objections. Pertaining to parentage, the juvenile court found that the magistrate correctly determined that Ohio law prevented C.E. from being established as a legal parent of the children and that *Obergefell* did not change this result.

**{¶13}** C.E. and P.S. now appeal the juvenile court's decision.

## II. Law and Analysis

### A. Standard of Review

**{¶14}** When ruling on objections to a magistrate's decision, Juv.R. 40(D)(4)(d) requires the juvenile court to "undertake an independent review as to the objected matters to ascertain that the magistrate has properly determined the factual issues and appropriately applied the law." This court reviews a juvenile court's decision on objections to a magistrate's decision for an abuse of discretion. *See, e.g., In re E.N.*, 1st Dist. Hamilton No. C-170272, 2018-Ohio-3919, ¶ 22. However, where the appeal presents only questions of law, this court's review is de novo. *See, e.g., In re J.P.*, 10th Dist. Franklin No. 16AP-61, 2016-Ohio-7574, ¶ 11.

### B. Parentage

**{¶15}** "The Constitution promises liberty to all within its reach, a liberty that includes certain specific rights that allow persons, within a lawful realm, to define and express their identity." *Obergefell*, 576 U.S. at 651-652, 135 S.Ct. 2584, 192 L.Ed.2d 609. "Under the Due Process Clause of the Fourteenth Amendment, no State shall 'deprive any person of life, liberty, or property, without due process of law.' " *Id.* at

663. The liberties protected by the Due Process Clause "extend to certain personal choices central to individual dignity and autonomy, including intimate choices that define personal identity and beliefs." *Id.*

{¶16} "The identification and protection of fundamental rights is an enduring part of the judicial duty to interpret the Constitution." *Id.* "[I]t requires courts to exercise reasoned judgment in identifying interests of the person so fundamental that the State must accord them its respect." *Id.* at 644. This inquiry is not bound by history and tradition. *Id.* Rather, the inquiry "respects our history and learns from it without allowing the past alone to rule the present." *Id.* "When new insight reveals discord between the Constitution's central protections and a received legal stricture, a claim of liberty must be addressed." *Id.*

{¶17} The right to marry is a fundamental constitutional right that applies with equal force to same-sex couples. *Id.* at 665. This right includes the "identified essential attributes of that right based in history, tradition, and other constitutional liberties inherent in this intimate bond." *Id.* One of the bases for protecting the right to marriage is that it safeguards children and families. *Id.* at 667. This includes not only the protection that marriage provides to children and families under state law, but also more profound benefits. *Id.* at 668. "By giving recognition and legal structure to their parents' relationship, marriage allows children 'to understand the integrity and closeness of their own family and its concord with other families in their community and in their daily lives.' " *Id.* Marriage is the foundation of family and society, and society supports married couples by "offering symbolic recognition and material benefits to protect and nourish the union." *Id.* at 669.

> Indeed, while the States are in general free to vary the benefits they confer on all married couples, they have throughout our history

made marriage the basis for an expanding list of governmental rights, benefits, and responsibilities. These aspects of marital status include: taxation; inheritance and property rights; rules of intestate succession; spousal privilege in the law of evidence; hospital access; medical decisionmaking authority; adoption rights; the rights and benefits of survivors; birth and death certificates; professional ethics rules; campaign finance restrictions; workers' compensation benefits; health insurance; and ***child custody, support, and visitation rules.*** * * *. The States have contributed to the fundamental character of the marriage right by placing that institution at the center of so many facets of the legal and social order.

There is no difference between same- and opposite-sex couples with respect to this principle. Yet by virtue of their exclusion from that institution, same sex-couples are denied the constellation of benefits that the States have linked to marriage. This harm results in more than just material burdens. Same-sex couples are consigned to an instability many opposite-sex couples would deem intolerable in their own lives.

(Emphasis added.) (Citations omitted.) *Id.* at 669-670.

{¶18} Under both the Due Process and Equal Protection Clauses, same-sex couples must be permitted to marry "on the same terms and conditions as opposite-sex couples." *Obergefell*, 576 U.S. at 675-676, 135 S.Ct. 2584, 192 L.Ed.2d 609; *Pavan*, 582 U.S. at 564, 137 S.Ct. 2075, 198 L.Ed.2d 636. The United States Supreme Court has continued to invalidate state laws that do not provide same-sex couples with the same "constellation of benefits" that are linked to marriage under state law. *See Pavan* at 566-567 (reversing a decision of the Arkansas Supreme Court which did not require

8

same-sex spouses to receive the same recognition as different-sex spouses under an Arkansas law that required a married woman's husband to appear as the child's father on the child's birth certificate when the child was conceived by means of artificial insemination).

{¶19} "When [the United States Supreme] Court applies a rule of federal law to the parties before it, that rule is the controlling interpretation of federal law and must be given full retroactive effect * * * as to all events, regardless of whether such events predate or postdate the announcement of the rule." *Harper v. Virginia Dept. of Taxation*, 509 U.S. 86, 113 S.Ct. 2510, 125 L.Ed.2d 74 (1993), syllabus.

{¶20} Here, the juvenile court found that *Obergefell* did not create a pathway under Ohio law for C.E. to be recognized as a legal parent of the children as the parties were never married. Although recognizing that the parties ended their relationship prior to *Obergefell*, the court failed to acknowledge the retroactive application of *Obergefell*. Specifically, the juvenile court did not consider whether the parties would have been married at the time the children were conceived but for Ohio's unconstitutional ban on same-sex marriage or consider how Ohio law contravenes the mandate of *Obergefell* that same-sex couples receive the same constellation of benefits linked to marriage as different-sex couples. The narrow question now before this court is whether the juvenile court should have considered whether the parties would have been married at the time the children were conceived—absent Ohio's unconstitutional ban on same-sex marriage—before determining whether C.E. could be established as a legal parent of the children under Ohio law.

{¶21} Under Ohio law, "[i]f a married woman is the subject of non-spousal artificial insemination and if her husband consented to the artificial insemination, the husband shall be treated in law and regarded as the natural father of a child conceived

9

as a result of the artificial insemination and a child so conceived shall be treated in law and regarded as the natural child of the husband." R.C. 3111.95(A). Under this section, the husband is conclusively considered to be the natural father of the child with respect to the father-and-child relationship, and no action or proceedings under R.C. 3111.01 to 3111.18 or R.C. 3111.38 to 3111.54 can affect the relationship. *Id.*

{¶22} Thus, under Ohio law, marriage provides the husband in such a situation with the benefit of a conclusively established father-and-child relationship with a child conceived by his wife as a result of the nonspousal artificial insemination. Under *Obergefell*, this marital benefit cannot constitutionally be deprived from a consenting same-sex spouse of a married woman as Ohio has linked the establishment of a parent-and-child relationship to the marriage in such a situation and therefore provides married couples with a form of legal recognition not available to unmarried couples. *See Pavan*, 582 U.S. at 567, 137 S.Ct. 2075, 198 L.Ed.2d 636 ("Arkansas has thus chosen to make its birth certificates more than a mere marker of biological relationships: The state uses those certificates to give married parents a form of legal recognition that is not available to unmarried parents. Having made that choice, Arkansas may not, consistent with *Obergefell*, deny married same-sex couples that recognition."); *see also Harrison*, 643 S.W.3d at 382-383 (analyzing a similar Tennessee statute and reaching the same result).

{¶23} If we were to simply hold that such legal recognition is not available to C.E. merely because the parties were not legally married at the time the children were conceived, we would be failing to consider the retroactive effect of *Obergefell* for parties that were not legally married due to Ohio's unconstitutional same-sex marriage ban, the fundamental harm caused by such unconstitutional ban, and the impacted children who are left without a conclusive parent-and-child relationship because of a

state wrong. To do so continues the harm that *Obergefell* was meant to remedy and does not provide due process or equal protection under the law. *See generally Pueblo v. Haas*, 511 Mich. 345, 352, 367-374 (2023) (holding that the court could not justifiably deny same-sex couples—who were never married but would have been before the birth of a child born as a result of in vitro fertilization but for Michigan's unlawful prohibitions on same-sex marriage—the benefit of utilizing Michigan's equitable-parent doctrine as the underlying rationale of the equitable-parent doctrine was served by the extension and the court's duty was to ensure that constitutional rights were safeguarded and further harms were not perpetrated).

{¶24} Rather, the only remedy this court sees for the unconstitutional deprivation of rights in this case, which safeguards not only the right to marry but the children involved in the relationship, is to recognize—in the limited circumstances where it is affirmatively established—marriages that would have existed at the time the children were conceived, absent Ohio's unconstitutional ban on same-sex marriage. *See Dick v. Reeves*, 1967 OK 158, 434 P.2d 295 (Okla.1967) (validating a ceremonial interracial marriage of a decedent performed prior to the United States Supreme Court's decision in *Loving*, 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010, and recognizing the decedent's spouse—post-*Loving*—for purposes of intestate succession); *see generally Brooks v. Fair*, 40 Ohio App.3d 202, 532 N.E.2d 208 (3d Dist.1988) ("It has never been the policy of this state to encourage the illegitimization of children."); R.C. 2151.01 ("The sections in Chapter 2151. of the Revised Code, with the exception of those sections providing for the criminal prosecution of adults, shall be liberally interpreted and construed so as to effectuate the following purposes: (A) To provide for the care, protection, and mental and physical development of children subject to Chapter 2151. of the Revised Code, whenever possible, in a family

environment, separating the child from the child's parents only when necessary for the child's welfare or in the interests of public safety; (B) to provide judicial procedures through which Chapters 2151. and 2152. of the Revised Code are executed and enforced, and in which the parties are assured a fair hearing, and their constitutional and other legal rights are recognized and enforced."). We find this remedy to be within the clear intent of R.C. 3111.95 of legitimizing any child(ren) conceived under the circumstances of the statute by two consenting parents—who would have been married absent the ban—and ensuring that both consenting parents are responsible for the child(ren)'s welfare. *See generally Treto v. Treto*, 622 S.W.3d 397, 402 (Tex.App.2020) (reviewing and interpreting the Texas parentage code in a manner consistent with the legislative intent of the statutes and the guarantees of equal protection).

{¶25} We note that, contrary to the juvenile court's finding, the Ohio Supreme Court's decision in *In re Mullens*, 129 Ohio St.3d 417, 2011-Ohio-3361, 953 N.E.2d 302, does not prevent a determination of parentage in this case. The issue presented to the court in *Mullens* was "whether a parent, by her conduct with a nonparent, entered into an agreement through which the parent permanently relinquished sole custody of the parent's child in favor of shared custody with the nonparent." *Id*. at ¶ 1. Thus, the issue of who may be considered a parent under Ohio's parentage statutes was not directly before the court. Yet, citing to *In re Bonfield*, 97 Ohio St.3d 387, 2002-Ohio-6660, 780 N.E.2d 241, the court did say that "Ohio does not recognize a parent's attempt to enter into a statutory 'shared parenting' arrangement with a nonparent, same-sex partner because the nonparent does not fall within the definition of 'parent' under the current statutes." *Id*. at ¶ 11. However, we must recognize that there was no argument presented to the court in *Mullens* pertaining to who may be considered

a parent under Ohio law, and the Ohio Supreme Court's decision in *Bonfield* does not govern this case.

{¶26} In *Bonfield*, the Ohio Supreme Court—when addressing the parental rights of a same-sex partner—looked to R.C. 3111.01 for the definition of a "parent," and recognized three ways a parent-and-child relationship could be established: (1) by natural parenthood, (2) by adoption, or (3) "by other legal means in the Revised Code that confer or impose rights, privileges, and duties upon certain individuals." *Id*. at ¶ 28. The parties—at a time prior to *Obergefell* when same-sex marriage was prohibited in Ohio—argued that R.C. 3111.95(A) provided "other legal means" by which parental rights could be recognized and advocated for a four-part test to be utilized when determining whether a same-sex partner should be treated as a parent under R.C. 3111.95(A). *Id*. at ¶ 29-30, 55. The court ultimately rejected the asserted four-part test proposed by the parties, but never rejected the general claim that R.C. 3111.95(A) created other legal means by which parental rights may be conferred under Ohio law. *Id*. at ¶ 34.

{¶27} R.C. 3111.95(A) clearly creates "other legal means" by which parental rights are conferred on certain individuals under Ohio law, and—as established above—the United States Supreme Court's subsequent decision in *Obergefell*, 576 U.S. at 675-676, 135 S.Ct. 2584, 192 L.Ed.2d 609, clearly compels the result that such legal recognition is equally extended to same-sex spouses. Therefore, neither *Mullens* nor *Bonfield* is contrary to our holding in this case.

{¶28} Accordingly, for all the foregoing reasons, we hold that the trial court should have considered whether, but for Ohio's unconstitutional ban on same-sex marriage, the parties would have been married at the time the children were born before determining that *Obergefell* did not create a pathway for C.E. to be recognized

as a legal parent of the children under Ohio law. *See In re Domestic Partnership of Madrone*, 271 Or.App. 116, 128, 350 P.3d 495 (2015) (holding that *choice*—and not merely intent to parent—was the key to the determination of whether a similar statute should apply to a particular same-sex couple that was not permitted to marry in Oregon and therefore the factual question to be answered was whether the parties *would have* been married before the children were born had they been able to do so).

{¶29} We emphasize that this opinion does not decide any question beyond the narrow issue before this court or make any determination that this same question can or should be utilized when deciding any other rights and liabilities relating to marriage or children in Ohio. Rather, this opinion is meant to solely address the narrow set of cases in which, absent the chance to prove the parties would have been married at the time of the child(ren)'s conception had they been able to do so, the party lacks any remedy to right the wrong created by the unconstitutional deprivation of her rights, which in this case is the inability to establish parental rights, particularly under R.C. 3111.95(A), based on a marriage in the same manner as a different-sex spouse under Ohio law.

{¶30} P.S. points to *Candelaria v. Kelly*, 535 P.3d 234 (Nev.2023), and argues that the "would-have-married" standard usurps legislative authority in states—such as Ohio—that do not recognize common-law marriage since common-law marriage is not recognized even for different-sex couples. We disagree. In a common-law marriage, the parties involved have to their avail the personal choice to be legally married but choose not to do so. Here, the parties were unconstitutionally deprived of their personal choice and ability to be lawfully married in their home state and of recognition of a lawful marriage entered in another jurisdiction.

**{¶31}** In *Candelaria*, the Nevada Supreme Court hinged the retroactive effect of *Obergefell* to the date of solemnization. *Candelaria* at 237-238. We find this to be illogical in a situation where the exact issue is that the parties were unconstitutionally deprived of their personal choice and freedom to lawfully marry in their home state or have a lawful marriage recognized. In essence, the decision in *Candelaria* detriments parties whose decision not to marry or solemnize their union was based on circumstances beyond their control: their home state's unconstitutional ban on same-sex marriage. *See generally, e.g., In re Harper*, 1st Dist. Hamilton No. C-800045, 1981 Ohio App. LEXIS 4967 (Jan. 1, 1981) (holding that the paramount status of the natural parent's right to custody would be destroyed where the basis of an unsuitability finding was circumstances beyond the parent's control). Further, the sole question before the court in *Candelaria* was the determination of a date of a marriage for purposes of *property division in a divorce*. *Candelaria* at 235. As we have already emphasized, this court is not reaching any conclusion on whether the same question used here pertaining to parentage can or should be utilized when deciding any other rights and liabilities relating to marriage or children in Ohio. Accordingly, we do not find *Candelaria* to be persuasive here.

**{¶32}** Nevertheless, we caution that the question to be answered is not whether the parties held themselves out as married at the time. The necessary inquiry should not be decided in favor of a marriage based solely on facts analogous to a determination of common-law marriage as Ohio does not recognize common-law marriage even for different-sex couples. This is not to say that some of the same considerations inquired upon for common-law marriage may not be used to aid the trier of fact in making a credibility determination as these factors most certainly may be relevant when assessing the credibility of the parties at issue. In fact, any number

15

of factors may ultimately be relevant when assessing credibility and determining whether the parties would have been married at the time of the child(ren)'s conception, but for Ohio's unconstitutional ban on same-sex marriage.

{¶33} We recognize that decisions about marriage "are among the most intimate that an individual can make." *Obergefell*, 576 U.S. at 646, 666, 135 S.Ct. 2584, 192 L.Ed.2d 609. Accordingly, the trial court should proceed with caution in ensuring that the effect of a marriage is not imposed on a party that would not have mutually assented to the marriage, while also recognizing the restrictive situation the parties were placed in due to the unconstitutional ban on their liberty.

{¶34} If it is credibly established that the parties would have been married at the time a child was conceived absent the ban, then this court is of the opinion that marriage should be recognized for the purposes of determining parental rights, particularly under R.C. 3111.95(A). In other words, this opinion has one specific purpose: to allow for the recognition of marriages in limited situations where the parties would have been married at the time that a child was conceived had they been legally able to do so and have the marriage recognized in their home state. It is meant to right a wrong for which this court sees no other remedy, and to safeguard the children involved by preserving the irreplaceable bond that is the parent-and-child relationship.

{¶35} Accordingly, we sustain C.E.'s cross-assignment of error as we hold that the trial court should have determined whether the parties would have been married at the time of the child(ren)'s conception before deciding that *Obergefell* did not create a pathway for C.E. to become a parent under Ohio law.

## IV. Conclusion

**{¶36}** Having sustained C.E.'s cross-assignment of error, we reverse the judgment of the trial court pertaining to the determination of parentage and remand the cause for further proceedings consistent with this opinion and the law. We note that the juvenile court may hear additional evidence under Juv.R. 40(D)(4)(d).

**{¶37}** Because the trial court's judgment on remand could render P.S.'s assignments of error pertaining to custody and visitation moot, determination of the assignments of error is premature and we decline to address them.

Judgment reversed and cause remanded.

**WINKLER** and **KINSLEY, JJ.,** concur.

Please note:

The court has recorded its own entry this date.