**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *In re L.E.S.*, Slip Opinion No. 2026-Ohio-1449.]**

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2026-OHIO-1449

IN RE L.E.S., E.S., AND N.S.

**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *In re L.E.S.*, Slip Opinion No. 2026-Ohio-1449.]**

*Domestic relations—Parentage—R.C. 3111.95(A), which provides an avenue for the consenting spouse of a woman who conceives a child through artificial insemination to be recognized as the natural parent of the child, does not apply to same-sex couples who were not married at time of insemination— Court of appeals' judgment reversed and cause remanded.*

(No. 2024-0303—Submitted April 22, 2025—Decided April 28, 2026.)

APPEAL from the Court of Appeals for Hamilton County,
Nos. C-220430 and C-220436, 2024-Ohio-165.

_____

DEWINE, J., authored the opinion of the court, which KENNEDY, C.J., and FISCHER, DETERS, HAWKINS, and SHANAHAN, JJ., joined. BRUNNER, J., concurred in judgment only, with an opinion.

**DEWINE, J.**

{¶ 1} This case involves a dispute about parenting rights. The litigants, P.S. and C.E., are two women whose relationship ended before the United States Supreme Court recognized a constitutional right to same-sex marriage in *Obergefell v. Hodges*, 576 U.S. 644 (2015).

{¶ 2} While the women were still in a relationship, P.S., gave birth to three children through artificial insemination. After the relationship ended, her former partner, C.E., sought to be legally recognized as a parent of the children. Because the couple was never married, nothing in Ohio's statutory scheme provided an avenue for C.E. to be recognized as a parent of the children. Nonetheless, the First District Court of Appeals concluded that the appropriate course was to remand the case to the trial court to determine if the couple "would have been married" if same-sex marriage had been legal in Ohio at the time of their relationship, 2024-Ohio-165, ¶ 35 (1st Dist.); *see also id.* at ¶ 36.

{¶ 3} In doing so, the court of appeals relied on R.C. 3111.95(A) ("the non-spousal artificial insemination statute"), which allows the consenting spouse of a woman who conceives through artificial insemination using donor sperm to be recognized as the natural parent of the child. Although the statute does not apply to couples who are unmarried, the First District concluded that under *Obergefell* and *Pavan v. Smith*, 582 U.S. 563 (2017), the statute should be judicially modified to apply retroactively to an unmarried same-sex partner if the couple would have been married but for Ohio's ban on same-sex marriage. *See* 2024-Ohio-165 at ¶ 34 (1st Dist.)

{¶ 4} The question before this court is whether the First District erred in empowering the trial court to retroactively create a marriage under this "would have been married" standard. We hold that it did. By its plain terms, the non-spousal artificial insemination statute does not apply to an unmarried couple. And nothing

2

in United States Supreme Court precedent provided a basis for the First District to disregard the plain terms of the Ohio statute. Because the First District disregarded the statutory scheme, we reverse its judgment.

## I. BACKGROUND

### A. A Relationship and a Breakup

{¶ 5} P.S. and C.E. began a romantic relationship in 2003. Despite moving in together and exchanging silver and gold bracelets to symbolize an engagement, the couple never married. Same-sex marriage was not recognized in Ohio but was legal in a number of other states during the time they were together.

{¶ 6} Nearly a decade into their relationship, P.S. become pregnant through artificial insemination. A daughter was born in 2012, and the couple executed a shared-custody agreement for her. In 2014, P.S. again conceived through artificial insemination and gave birth to twins. Unlike the situation with the older child, the couple did not execute a shared-custody agreement for the twins.

{¶ 7} The couple separated in January 2015, shortly before the United States Supreme Court's decision in *Obergefell*, 576 U.S. 644, which held state prohibitions on same-sex marriage to be unconstitutional. After the breakup, the children lived primarily with P.S. but also visited at times with C.E.

### B. Litigation Ensues

{¶ 8} In 2018, P.S. filed a motion to hold C.E. in contempt for failing to abide by the older child's shared-custody agreement, and a motion to terminate or modify the shared-custody agreement based on changed circumstances. C.E. countered by filing a complaint seeking parentage and custody over all three children or at least shared custody or visitation rights with the twins. A magistrate denied C.E.'s request to be named a legal parent of all three children and for shared custody of the twins. The magistrate also denied P.S.'s request to terminate the

shared-custody agreement for the older child. The magistrate did, however, award C.E. companionship time with the twins.

{¶ 9} Both parties filed objections to the magistrate's decision. C.E. argued that the Supreme Court's decision in *Obergefell* required Ohio's existing parentage statutes to be applied to same-sex couples. She also asserted that Ohio's paternity provisions "post-*Obergefell*" impermissibly focus on "'men'" and "'DNA,'" "ignoring artificial reproductive technology and family formation for same-sex couples."

{¶ 10} The trial court affirmed most of the magistrate's decision. It concluded that no statute or caselaw granted it authority to recognize as a child's legal parent a same-sex partner of that child's biological parent. Nevertheless, the court found that the parties had entered into a shared-parenting agreement for all three children. In addition to the written custody agreement for the older child, the court concluded that the parties had created a shared-custody agreement "through their words and conduct" for the twins. *In re: E.C.E.S.*, Hamilton J.C. No. F/12/000728 Z (Aug. 5, 2022). The court upheld the companionship-time schedule issued by the magistrate as being in the best interests of the children.

{¶ 11} Both parties appealed to the First District. On appeal, C.E. presented a new elaboration of her argument for parentage rights. She cited the non-spousal artificial insemination statute, which provides an avenue for a husband to be recognized as the biological father of children born to his wife by artificial insemination and donor sperm. C.E. argued that the United States Supreme Court's decisions in *Obergefell*, 576 U.S. 644, and *Pavan*, 582 U.S. 563, require the statute to be applied gender neutrally so as to include same-sex couples. P.S. argued in her reply brief to the First District that the court should not consider C.E.'s argument about the non-spousal artificial insemination statute, because C.E. had not presented that argument in the trial court.

{¶ 12} P.S. appealed on the grounds that the trial court had acted beyond its judicial authority in relying on *Obergefell* to abrogate the existing custody and parenting framework. She claimed the court also erred by not terminating the custody agreement for the older child and by awarding C.E. companionship time with the twins. Finally, P.S. argued the court erred in its determination that a shared-custody agreement existed for the twins.

{¶ 13} The First District proceeded to the merits of the parentage issue without addressing P.S.'s contention that C.E. had failed to sufficiently develop her argument about the non-spousal artificial insemination statute in the trial court.[1] It held that the trial court "should have first determined whether the parties would have been married at the time of the child(ren)'s conception—but for Ohio's unconstitutional ban on same-sex marriage—before finding that C.E. could not be recognized as a legal parent of the child(ren) under Ohio law." (Parentheses in original.) 2024-Ohio-165 at ¶ 4 (1st Dist.). The court of appeals found that if the parties would have been married, *Obergefell* would require the non-spousal artificial insemination statute to be interpreted gender-neutrally and applied to C.E. *Id.* at ¶ 22-23, 34. The First District remanded the case to the trial court to determine if a marriage "would have" occurred. *Id.* at ¶ 35-36. The court did not address P.S.'s assignments of error, concluding that the trial court's determination of whether the parties would have been married could render the custody and visitation issues moot. *Id.* at ¶ 4.

{¶ 14} P.S. appealed to this court, raising a single proposition of law, which we accepted:

---

1. The opinion concurring in judgment only would reverse the First District on the basis that the court of appeals erred by considering C.E.'s underdeveloped argument about the non-spousal artificial insemination statute. But P.S. forfeited any argument in that regard by failing to raise it in the proposition of law and briefing that she presented to this court. *See State v. Townsend*, 2020-Ohio-5586, ¶ 12, fn.1.

Neither the state nor federal Constitution empower a state court to ignore state statutes barring common-law marriage, manufacture an unlicensed marriage into existence, and hinder a parent's fundamental rights based on that manufactured unlicensed marriage.

*See* 2024-Ohio-1832.

## II. ANALYSIS

{¶ 15} Ohio has established an elaborate statutory scheme for determining parentage. We begin there. We then turn to the question whether the First District was correct in concluding that United States Supreme Court caselaw requires a rewrite of that statutory scheme. Finally, we turn to P.S.'s argument that the First District improperly ignored Ohio's statutory rejection of common-law marriage.

### A. C.E. Is Not Entitled to Relief Under the Plain Terms of Ohio's Parentage Statutes

{¶ 16} By Ohio statute, a woman may establish parentage through proof of having given birth. R.C. 3111.02(A). A man is presumed to be a child's parent if he is married to the child's mother, R.C. 3111.03(A)(1), but may also establish parentage by filing an acknowledgment of paternity, R.C. 3111.03(A)(3), or presenting evidence of paternity in a parentage action, R.C. 3111.10. An adoptive parent may establish parentage through proof of adoption. R.C. 3111.02(A).

{¶ 17} Ohio's non-spousal artificial insemination statute provides an avenue for the consenting spouse of a woman who conceives through artificial insemination to be recognized as the natural parent of the child. *See* R.C. 3111.95(A). That statutory provision provides:

> If a married woman is the subject of a non-spousal artificial insemination and if her husband consented to the artificial insemination, the husband shall be treated in law and regarded as the natural father of a child conceived as a result of the artificial insemination, and a child so conceived shall be treated in law and regarded as the natural child of the husband.

R.C. 3111.95(A).

{¶ 18} The First District relied on this statutory provision in reversing the trial court's determination of parentage and remanding the matter to the trial court to consider whether the parties "would have been married at the time the children were born" if same-sex marriage had been recognized in Ohio at that time. 2024-Ohio-165 at ¶ 28 (1st Dist.).

{¶ 19} By its plain terms, the statute does not apply to P.S. and C.E. The statute applies only to married couples, and it is undisputed that P.S. and C.E. were not married at the time of the inseminations. Courts, of course, ordinarily have no authority to rewrite statutes. It is "only when . . . clear incompatibility between the constitution and the law appear, that the judicial power can refuse to execute it." *Cincinnati, Wilmington & Zanesville RR. Co. v. Clinton Cty. Commrs.*, 1 Ohio St. 77, 83 (1852). So the only way that we may uphold the First District's judgment is if we determine that authority from the United States Supreme Court—which we are bound to follow under the Supremacy Clause of the United States Constitution, *see* U.S. Const., art. VI, cl. 2—requires that the statute be rewritten and retroactively applied to same-sex couples who would have been married had same-sex marriage been legal in Ohio at the time of the artificial inseminations.

### B. United States Supreme Court Precedent Does Not Empower Ohio Courts to Retroactively Apply the Non-Spousal Artificial Insemination Statute to Unmarried Couples

{¶ 20} The First District relied on two decisions of the United States Supreme Court to support its remand order: *Obergefell*, 576 U.S. 644, and *Pavan*, 582 U.S. 563. But neither case warrants a retroactive rewrite of Ohio's non-spousal artificial insemination statute to include unmarried couples.

{¶ 21} The Supreme Court in *Obergefell* held invalid under the Fourteenth Amendment to the United States Constitution state laws "to the extent they exclude same-sex couples from civil marriage on the same terms and conditions as opposite-sex couples," *Obergefell* at 675-676, and it held that states must recognize same-sex marriages validly performed in other states, *id.* at 680. *Obergefell* did not consider any retrospective implications of its holding on states that had not previously recognized same-sex marriage.

{¶ 22} Two years later, the Supreme Court applied *Obergefell* in *Pavan*. At issue in *Pavan* was an Arkansas law requiring a husband to be listed as the father on the birth certificate of any child born to his wife. *Pavan* at 564. The Court held in a per curiam opinion that because Arkansas chose "to give married parents a form of legal recognition that is not available to unmarried parents," *id.* at 567, and because *Obergefell* requires states to provide married same-sex couples the same "'constellation of benefits that the States have linked to marriage,'" the law must be applied equally to the wife of a birth mother as it would be to a husband, *id.* at 564, quoting *Obergefell* at 670. Together, *Obergefell* and *Pavan* stand for the proposition that states must provide same-sex couples equal access to marriage and then, once married, the same "constellation of benefits" they furnish to opposite-sex couples.

{¶ 23} *Pavan* presumably means that a married same-sex spouse could take advantage of the non-spousal artificial insemination statute even though the

statutory language refers only to a "husband," R.C. 3111.95(A). But nothing in *Pavan* or *Obergefell* suggests that the statute should be rewritten to apply to unmarried couples. Nor do those cases support the First District's "would they have been married" inquiry.

{¶ 24} Even though same-sex marriage was legal in over a dozen states[2] prior to P.S. and C.E.'s split in 2015, P.S. and C.E. chose not to get married in any of those states. If they had, *Obergefell* would require Ohio to recognize that marriage and C.E. would have a strong argument that the non-spousal artificial insemination statute should be applied in a gender-neutral manner to her. *See Pavan*, 582 U.S. at 563, 566. But because access to the non-spousal artificial insemination statute turns on marital status, C.E. cannot use the statute to establish parentage.

{¶ 25} The non-spousal artificial insemination statute does not provide a pathway for an unmarried partner who does not have a biological connection to the child for whom he or she seeks to establish parentage to be recognized as that

---

2. *See Perry v. Schwarzenegger*, 704 F.Supp.2d 921, 1004 (N.D.Cal. 2010) (holding unconstitutional California's voter-enacted amendment to the California Constitution providing that marriage between only a man and a woman was valid or recognized in the state); Former Conn.Gen.Stat.Ann. 46b-20, 2009 Conn.Acts 79 (Reg.Session) (effective Apr. 23, 2009) (current version at Conn.Gen.Stat.Ann. 46b-20 and 46b-20a); Haw.Rev.Stat.Ann. 572-1, 2013 Haw.Sess.Laws 1 (2d Sp.Sess.) (effective Dec. 2, 2013); 750 Ill.Ann.Stat. 5/201, 2013 Ill.Laws 7141, 7143 (effective June 1, 2014); Me.Rev.Stat.Ann. 19-A, § 650-A, 2013 Me.Laws 1125 (effective Dec. 29, 2012); Md.Code Ann., Fam.Law 2-201(b), 2012 Md.Laws 9, 10 (effective Jan. 1, 2013); *Goodridge v. Dept. of Public Health*, 440 Mass. 309, 344 (2003) (holding that "barring an individual from the protections, benefits, and obligations of civil marriage solely because that person would marry a person of the same sex violates the Massachusetts Constitution"); Minn.Stat.Ann. 517.01, 2013 Minn.Laws 404, 405 (effective Aug. 1, 2013); *Latta v. Otter*, 771 F.3d 456, 476-477 (9th Cir. 2014) (permanently enjoining Idaho and Nevada "from enforcing any constitutional provision, statute, regulation or policy preventing otherwise qualified same-sex couples from marrying"); Former N.H.Rev.Stat.Ann. 457:1-a, 2009 N.H.Laws 60 (effective Jan. 1, 2010); *Garden State Equality v. Dow*, 434 N.J.Super. 163, 219 (2013) (holding that "to satisfy the equal protection guarantees of the New Jersey Constitution," same-sex couples must be allowed to marry); N.Y.Dom.Rel.Law 10-a, 2011 N.Y.Laws 749 (effective July 24, 2011); 15 R.I.Gen.Laws 15-1-1, 2013 R.I.Pub.Laws 15 (effective Aug. 1, 2013); Vt.Stat.Ann. tit. 15, § 8, 2009 Vt.Acts & Resolves 33 (effective Sept. 1, 2009); Former Wash.Rev.Code 26.04.010, 2012 Wash.Sess.Laws 199, 200 (effective Dec. 6, 2012).

child's parent. This applies equally to opposite- and same-sex partners. *Obergefell* and *Pavan* do not compel courts to create an extra-legislative pathway for same-sex couples to access marital privileges when the couple was never married.

**C. The First District's "Would Have Been Married" Inquiry Is Unworkable and at Odds with Ohio's Rejection of Common-Law Marriage**

{¶ 26} We should reverse the First District's judgment because its "would have been married" inquiry is incompatible with the statutory scheme. But it's worth pointing out that the test the First District would have the trial court apply—and presumably other trial courts in similar cases—is one that courts are ill-suited to perform.

{¶ 27} How is a court to determine what parties would have done had same-sex marriage been legal in Ohio? Some couples may have chosen to remain unmarried for financial or personal reasons. Or, as sometimes happens, the relationship could have ended when the topic of marriage arose. Even if a couple took "steps" toward marriage, like moving in together or getting engaged, there's no guarantee they would have gotten married. After all, brides and grooms sometimes get cold feet. But the First District's mandate would put trial courts in the position of trying to guess what the parties would have done had same-sex marriage been legal.

{¶ 28} Look no further than the facts currently before this court for an example of the inquiry's unworkability. C.E. claims that she proposed to P.S., that they had a civil commitment ceremony, and that they traveled to Boston to get married, only to abandon their plans when they learned that Ohio would not recognize the out-of-state marriage. But P.S. denies that any civil commitment ceremony happened and says she never intended to marry C.E. Even if the trial court were to accept C.E.'s version of events, it's still not certain that the parties would have actually gotten married had the option been available to them in Ohio. The "would have been married" inquiry therefore sets trial courts out on an

impossible mission to retroactively determine whether a different reality would have produced different events. That's a tough ask of trial courts.

{¶ 29} Indeed, the First District's "would have been married" test comes close to resurrecting the old test for common-law marriage in Ohio that applied before the General Assembly prohibited common-law marriages. *See* R.C. 3105.12(B)(1) ("On and after October 10, 1991, . . . common law marriages are prohibited in this state" and a marriage "may occur in this state only if the marriage is solemnized by" an authorized person and otherwise in compliance with Ohio law.). Under prior law, common-law marriages were "not favored" in Ohio and could be established only with proof of cohabitation and reputation of the marriage between a competent man and woman, along with a "meeting of the minds." *Nestor v. Nestor*, 15 Ohio St.3d 143, 145-146 (1984), citing *Umbenhower v. Labus*, 85 Ohio St. 238 (1912), syllabus. Moving in or buying a home together was evidence of cohabitation. *See, e.g.*, *Nestor* at 147 (sleeping together in the same bedroom after moving in together is evidence of cohabitation). Referring to each other as "spouse" or attending family events together fulfilled the reputation prong of common-law marriage. *See, e.g.*, *Markley v. Hudson*, 143 Ohio St. 163, 167-169 (1944). A proposal, the exchange of wedding bands, or a commitment ceremony was all evidence of a couple's holding themselves out as married in the community. *See, e.g.*, *Leibrock v. Leibrock*, 107 N.E.2d 418, 421 (1952) (finding that, among other things, the gifting and wearing of rings by the parties was evidence of their common-law marriage). A signed companionship or "marital" agreement, even if it had no legal effect, could be evidence of the couple's intent to marry and satisfy the "meeting of the minds" requirement of common-law marriage. *See, e.g.*, *Nestor* at 147-148 (parties' contract of marriage was sufficient to demonstrate their intention to be married).

{¶ 30} The First District's "would have been married" inquiry would largely resurrect the former common-law-marriage test. The evidence required to satisfy its "would have been married" inquiry is virtually indistinguishable from what was required to establish a common-law marriage. The General Assembly expressly rejected that type of marriage when it banned common-law marriage in 1991, and it is not within the First District's power to judicially revive it.

## III. CONCLUSION

{¶ 31} Ohio's parentage statutes do not authorize the First District Court of Appeals to remand this case to the trial court to determine if C.E. and P.S. "would have been married." We therefore reverse the court of appeals' judgment and remand this case to that court to consider the remaining assignments of error.

Judgment reversed
and cause remanded.

_____

**BRUNNER, J., concurring in judgment only.**

{¶ 32} Ignoring the well-established rule that appellate courts "will not consider a question not presented, considered or decided by a lower court," *Kalish v. Trans World Airlines, Inc.*, 50 Ohio St.2d 73, 79 (1977), the First District Court of Appeals erroneously decided this case solely on an unpreserved issue. I would reverse the First District's judgment and decline to consider the merits of this appeal because such consideration would only compound that error. Therefore, I concur in the court's judgment only.

{¶ 33} Although appellee, C.E., did not challenge the constitutionality of any Ohio law, her argument in the juvenile court was essentially that Ohio's statutory scheme involving the parentage and parenting[3] of children by same-sex

_____

3. R.C. 3111.01(A) defines a "parent-child relationship" (i.e., parentage) as "the legal relationship that exists between a child and the child's natural or adoptive parents." But *parentage* is not

parents is deficient and lagging, especially since same-sex marriage and family formation has been recognized by the United States Supreme Court as lawful and constitutionally protected in *Obergefell v. Hodges*, 576 U.S. 644 (2015). According to C.E., she had been a parent to the children born to appellant, P.S., during their 12-year relationship as much as she possibly could. And she believed that denying her and the children the legal rights and obligations that a parent-child relationship confers—simply because the General Assembly failed to update Ohio's laws post-*Obergefell* to recognize her family's formation—was unconstitutional and harmful to her family. She asked the juvenile court to essentially use its full power in equity to fill omissions in Ohio law to legally recognize her relationship with the children.

{¶ 34} C.E. advocated that the juvenile court find that she had established a "'*legal fiction* of biological parentage.'" (Emphasis added in closing argument.) C.E.'s Written Closing Argument, quoting *In re Parentage of M.F.*, 312 Kan. 322 (2020), paragraph one of the syllabus. Under that argument, C.E. maintained that laws for the establishment of paternity in Ohio—R.C. 3111.01 through 3111.18— could be applied to her through R.C. 3111.17, which provides that "[i]nsofar as practicable," those statutes apply to an action brought to determine a mother-child relationship. And she argued that those statutes lay a path for unmarried same-sex couples to establish parentage consistent with the principles explained in *Obergefell*. According to C.E., integrating the application of R.C. 3111.01 through 3111.18 would extend to families like hers the "constellation of benefits . . . linked to marriage," *Obergefell* at 646-647, 670, even though she and P.S. never married

necessarily a prerequisite to establishing parenting responsibilities related to the care of children or to receiving court-ordered visitation and related responsibilities. *See In re Bonfield*, 2002-Ohio-6660, ¶ 36 (recognizing that a shared-custody agreement may be entered into by a parent and nonparent); *Rowell v. Smith*, 2012-Ohio-4313, ¶ 1, 3-4, 22 (upholding a juvenile-court order granting a nonparent temporary visitation).

in Ohio or in a state where same-sex marriage was recognized as legal before the *Obergefell* decision was issued by the United States Supreme Court.

{¶ 35} But when C.E. appealed to the First District, she abandoned the theory that she had used in the juvenile court—that she could establish parentage through the statutes that unmarried fathers use to establish their paternity. Instead, she argued for the first time that if she and P.S. had been married when the children were born, she could be found to be the legal parent of the children under R.C. 3111.95(A), a law that confers the legal status of natural parent to the husband of a woman who bears a child conceived through nonspousal artificial insemination when the husband consented to the procedure.

{¶ 36} C.E. never asked the juvenile court to retroactively apply R.C. 3111.95(A) to determine her legal rights. She did not ask the juvenile court to find that she and P.S. would have gotten married but for Ohio's ban on same-sex marriage. C.E.'s focus was on her and P.S.'s mutual intent to raise the children as coparents and their actions in furtherance of that intent. And critically, this new argument was not raised in C.E.'s objections to the magistrate's decision, resulting in a waiver of the issue on appeal. *See* Civ.R. 53(D)(3)(b)(iv) (failure to object to a magistrate's factual findings or legal conclusions generally precludes appellate review of that issue). Because C.E. failed to raise this argument in her objections to the magistrate's decision, the juvenile-court judge did not consider it in rendering her decision.

{¶ 37} The First District should not have considered C.E.'s assignment of error pertaining to R.C. 3111.95(A). Nor should it have reversed the judgment of the juvenile court based on a legal argument that C.E. did not raise in that court.

This is especially the case when the evidence in the record does not support such an outcome.[4]

{¶ 38} The juvenile court was careful to recognize the importance of the rights at stake here. It aptly acknowledged the "disconnect between the laws of this state and the precedent set by the highest courts," including the failure to "make appropriate accommodations for same-sex couples in line with the case law regarding family formation," *In re E.C.E.S.*, Hamilton J.C. No. F12-728 Z (Dec. 5, 2019). But the First District did not have the power to fashion a legal remedy for this problem when that remedy was never presented to the juvenile court by any party. *See Greenlaw v. United States*, 554 U.S. 237 (2008) ("the courts generally serve as neutral arbiters of *matters the parties present*" [emphasis added]). The majority opinion and the First District's decision present two sides of a novel question that was never presented or factually developed in the juvenile court. Rather than follow the First District's path, we should exercise restraint and summarily reverse the First District's judgment and remand this matter to that court for it to consider the remaining assignments of error. Because the majority does otherwise, I concur in judgment only.

_____

Durst Kerridge, L.L.C., Paul R. Kerridge, and Alexander J. Durst; and Link Nestheide Family Law and Diana M. Link, for appellant.

Hilton Parker, L.L.C., Johnathan L. Hilton, Geoffrey C. Parker, and Eliza Bauler O'Grady; and The Family Law and Fertility Group and Danielle L. Levy, for appellee.

Frost Brown Todd, L.L.P., and Ryan W. Goellner; and Hupp Margolis & Leak, L.L.C., and Jason A. Paskan, urging affirmance for amicus curiae The

_____

4. The First District included in its remand order that the juvenile court could take additional evidence, 2024-Ohio-165, ¶ 36 (1st Dist.), which further establishes that C.E. failed to develop in the lower court the arguments that formed the basis of the First District's judgment.

Nathaniel R. Jones Center for Race, Gender, and Social Justice.

ACLU of Ohio Foundation, Amy R. Gilbert, and Freda J. Levenson, urging affirmance for amici curiae National Association of Social Workers Including its Ohio Chapter and American Civil Liberties Union of Ohio Foundation.

_____